FILETECH S.A., Filetech U.S.A., Inc., Plaintiffs–Appellants–Cross–Appellees,

v.

FRANCE TELECOM S.A., France Telecom Incorporated, Defendants–Appellees–Cross–Appellants.

Docket Nos. 97–9258, 97–9314.

United States Court of Appeals, Second Circuit.

Argued May 19, 1998.

Decided Oct. 6, 1998.

Ron Soffer, Fisher & Soffer, New York City (Ivan S. Fisher, of counsel), for Plaintiffs–Appellants–Cross–Appellees.

Francis J. Menton, Jr., Willkie Farr & Gallagher, New York City (Thomas H. Golden, Anne E. Beaumont, of counsel), for Defendants–Appellees–Cross–Appellants.

Before: KEARSE and MINER, Circuit Judges, and SCULLIN, District Judge.*

MINER, Circuit Judge:

Plaintiffs-appellants-cross-appellees Filetech S.A. and Filetech U.S.A., Inc. (collectively, "Filetech") appeal from so much of a judgment of the United States District Court for the Southern District of New York (Haight, J.) as dismissed the complaint in this action on the ground of international comity. According to the complaint, defendants-appellees-cross-appellants, France Telecom S.A. and France Telecom Incorporated (collectively, "France Telecom"), were engaged in anticompetitive conduct violative of various provisions of the Sherman Antitrust Act, 15 U.S.C. § 1 et seq. France Telecom cross-appeals from so much of the same judgment as denied dismissal of the complaint for lack of subject matter jurisdiction. The jurisdiction contention was grounded in (1) the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1602 et seq. ("FSIA"); and (2) the Foreign Trade Antitrust Improvements Act of 1982, 15 U.S.C. § 6a ("FTAIA").

For the reasons that follow, we vacate the judgment of the district court and remand for further proceedings consistent with this opinion.

## BACKGROUND

### I. The Parties and the Business

Filetech S.A., formerly known as Filetech S.A.R.L., is a French corporation with its principal place of business in France. It was formed in 1988 and is engaged in the business of selling marketing lists. These lists of French residents are tailored to meet various criteria required by its customers. Filetech S.A. obtains data on French residents from, among other sources, lists of telephone subscribers compiled by France Telecom S.A.

Filetech U.S.A., Inc. ("Filetech USA") is a subsidiary of Filetech S.A. It was incorporated in the State of New York, has a business office in New Jersey and has designated its

---

* The Honorable Frederick J. Scullin, Jr., of the United States District Court for the Northern District of New York, sitting by designation.

attorney's New York office for service of process. Filetech USA was formed in 1994 for the purpose of carrying out business operations in the United States. However, neither the complaint nor the record indicates that any business has thus far been conducted; rather, the complaint alleges that some such business might be conducted in the future.

France Telecom S.A. is a French corporation with its principal place of business in France. At the time the complaint was filed, France Telecom S.A. was wholly-owned by the Republic of France and owned and operated all telephone facilities in France. However, the passage of certain European Union directives has ended the monopoly of France Telecom S.A. and has required that the company incorporate, with the French government remaining the majority shareholder in the new corporate entity. France Telecom Inc. ("FTI"), a wholly-owned subsidiary of France Telecom S.A., is a New York corporation with New York as its principal place of business.

France Telecom S.A. engages in other commercial activities besides its telephonic services business. For example, it makes its lists of subscribers available so that marketing lists may be compiled from them. It engages in this business primarily through two services, "Teladresses" and "Marketis." The record indicates, however, that FTI has no involvement in this business either in the U.S. or abroad. "Teladresses" is a service that provides mailing lists tailored to a customer's particular criteria and is capable of generating lists of millions of names. Once the customer provides the relevant criteria, lists are generated and the customer is billed. "Marketis" is a service accessible through any personal computer with a modem, or through a "Minitel," a small computer terminal. This terminal is made available by France Telecom S.A. to its telephonic service customers on request and is designed exclusively to provide access to the databases of France Telecom S.A. Using Marketis through either the Minitel on-line service or a Minitel terminal, a customer can develop a specialized mailing list. Minitel services are available in the U.S. through France Telecom S.A.'s indirect subsidiary, Minitel Services Company ("MSC").

The parties dispute each other's contentions with respect to the nature and amount of commercial activity undertaken by France Telecom S.A. in the United States. France Telecom claims that it has not sold a significant number of mailing lists in the U.S. For example, it asserts that the amount of "Teladresses" usage originating here in 1993 and 1994—the most recent years for which data is available—is *de minimis*. In 1993, exactly one bill for an amount of just over $3,500 was sent to a customer in the U.S. and, in 1994, not a single bill was sent to a customer here. France Telecom contends that the use of "Marketis" in the United States also was minimal. During the first four months of 1995, the year in which the present litigation was commenced, it asserts that not a single customer accessed Marketis through MSC. Between May and July of that year, U.S. subscribers to MSC accessed Marketis fourteen times, for a total duration of approximately one hour. At least six of these calls were placed by employees of either France Telecom S.A. or MSC as part of their investigation of Filetech's claims. Based on the total duration of these calls, France Telecom estimates that a maximum of about 1,500 names and addresses could have been downloaded.

France Telecom claims that it does not advertise its mailing lists business in the U.S. or engage in any other activity aimed at attracting American customers for such services. While France Telecom concedes that it markets Minitel through MSC, it contends that such marketing is not aimed at the mailing lists business. Marketis is only one of more than 23,000 services provided through Minitel, an "on-line" information service oriented to the French-speaking world. France Telecom also contends that most of the approximately 3,000 active subscribers to Minitel in the U.S., at the time of this litigation, were French individuals living in the U.S., French businesses located in the U.S. or French government personnel stationed in the U.S. Accordingly, France Telecom asserts that American citizens and American companies are not the targets of France Telecom S.A.'s limited U.S. marketing efforts.

In addition to Teladresses and Marketis, France Telecom S.A. offers marketing lists on a specially formatted version of a CD–ROM directory. However, at the time of submission of briefs to the district court, only thirty-four CD–ROMS had been sold worldwide, none of which sales occurred in the United States. France Telecom asserts that it neither markets nor intends to market such disks here.

Filetech paints a very different picture of the commercial activity of France Telecom in the United States. Filetech alleges that France Telecom engages in substantial commercial activity relating to the marketing lists business here. According to Filetech,

> France Telecom [S.A.] maintains extensive business in the United States directly and through several entities.... France Telecom [S.A.], markets its directory and data services, which are available through the Internet in 126 cities throughout the United States for the price of a local call. The brochure of the Minitel Services Company, a United States entity, tells its potential subscribers that they can compose mailing lists by accessing the directory in the United States.

Filetech also asserts that Minitel subscribers receive free software providing access to the mailing lists and that the data is also available via CD–ROM. Additionally, Filetech claims that FTI refers callers to a toll-free phone number, answered by an English-speaker, who can explain "the different possibilities of obtaining France Telecom data." France Telecom replies that this toll-free number rings in France at the "France Telecom International Business Center" and notes that if a caller in the United States wishes to purchase a mailing list, he or she is provided with a separate French phone number in order to make the necessary arrangements. This call, in turn, would require international toll charges to be incurred.

At oral argument, we pressed the parties on their contentions regarding the commercial activities of France Telecom in the United States. Filetech once again argued that individuals in over one hundred cities could access France Telecom S.A.'s database

through Minitel merely by dialing a local phone number via modem or Minitel terminal and using an access code obtained through Minitel. Filetech attached great weight to the fact that the required call is not an international one. It also contended that France Telecom markets its services via the Internet. France Telecom responded by pointing out (1) that during the two years prior to its motion to dismiss in the instant case, France Telecom had made only two sales of mailing lists in the U.S. through Teladresses; and (2) that its Marketis service had been used fourteen times, at least six of which involved uses by France Telecom S.A. itself or certain of its affiliates in preparation for the litigation subject of this appeal.

Notably, France Telecom asserted at oral argument that any individual in the United States seeking to obtain the phone lists, purged as hereinafter described, via Minitel, must possess a French phone number.[1] France Telecom admitted that, although it had always intended to require that customers have a French telephone account, Filetech at one point hired a computer specialist who had discovered a means of circumventing the requirement. However, according to France Telecom, the glitch in the system that allowed the circumvention was corrected as soon as it was discovered, and it is no longer possible to access the service without having a France Telecom S.A. phone account.

Finally, Filetech claims that France Telecom S.A. charges exorbitant prices for mailing lists in the U.S., thereby denying American businesses useful information. However, France Telecom submitted evidence to the district court indicating that France Telecom S.A.'s prices are comparable to, or lower than, those charged by American companies providing the same type of data.

## II. *Relevant Laws and Regulations in France & the European Union*

On January 6, 1978, the French legislature enacted the Data Processing and Individual Rights Law (the "Data Processing Act"). The Data Processing Act created La Com-

---

1. It is unclear, based on the record, precisely whether it is necessary that an individual have a phone service account in France or whether one need only have a France Telecom S.A. calling card account and the necessary hardware.

mission Nationale de l'Informatique et des Libertés, or the Data Processing and Individual Rights National Commission (the "CNIL"), an independent government agency that regulates public and private data processing activities. The Data Processing Act also sets forth substantive and procedural rules and principles regarding the processing of personal data. For example, pursuant to Article 26 of the Data Processing Act, any individual may refuse, for legitimate reasons, to allow personal data bearing on him or her to be computer processed. Breach of these provisions is punishable under the French Penal Code.

Consistent with the above, French law permits residents of France to block inclusion of their names on commercial mailing lists. By decree dated October 12, 1989, as amended on December 29, 1990, Article R. 10–1 of France's Postal and Telecommunications Code ("PTT Code"), provides that:

> All individuals ... may ... request, without being liable to pay any supplementary fee, not to appear on the lists extracted from the telephone book and marketed by [France Telecom S.A.]....
>
> The use by anyone, of information extracted from the telephone book concerning persons mentioned in the previous paragraph, for commercial purposes or for public diffusion, is prohibited.

This law obligates France Telecom S.A. to maintain a list of telephone subscribers who do not want their names to be used for marketing purposes. Pursuant to this law, France Telecom S.A. created the so-called "Orange List," [2] which contains the names of those subscribers who have indicated to France Telecom S.A. that they do not want their names, addresses or telephone numbers, as they appear in the telephone directory, to be used for commercial or marketing purposes.

In addition to paper telephone directories, France Telecom S.A. publishes an electronic directory, an on-line database of France Telecom S.A.'s yellow and white pages. The electronic directory covers all parts of France and is organized by software that enables rapid searches to find desired data. To recover its investment in the directory,

France Telecom S.A. has established charges for its use. However, the first three minutes of any use is free to France Telecom S.A. telephone subscribers, with a per-minute fee for use thereafter. Customers of France Telecom S.A. can access the electronic directory through a Minitel terminal or a personal computer. Because the electronic directory has not purged Orange List names, however, it is neither intended nor suitable for use in creating marketing lists.

France Telecom contends that it is precluded by French law from disclosing the names of the individuals on the Orange List. Accordingly, it has refused to provide Filetech with access to the list. Filetech disputes France Telecom's contention. It cites a public recommendation by the CNIL to the effect that France Telecom S.A. should indicate in its directory the names of individuals on the so-called Orange List.

France Telecom claims that the CNIL has indicated that subscribers who request to be on lists such as the Orange List have privacy interests that would be violated by disclosure of their names. In support of this assertion, it points to the CNIL's 1992 resolution approving the "Saffron List," which contains the names of France Telecom S.A. subscribers who do not wish to receive advertisements by facsimile or telex. At that time, the CNIL issued the following caution:

> [C]ommunicating the Saffron List would amount to making public a behavioral database devoted to persons hostile to commercial canvassing and could be detrimental to said persons. As such, the Saffron list can only be communicated indirectly, either via transmission of the entire list of telex/fax subscribers cleansed of the Saffron subscribers or by cleansing of those lists which will be communicated to France Telecom [S.A.].

In an effort to make its subscriber database available to other sellers of marketing lists and to comply with French laws and regulations, France Telecom S.A. prepared a database of its subscribers cleansed of the Orange List. It sells this database via Marketis, Teladresses and CD–ROM. Under this approach, France Telecom S.A. avoids what

---

**2.** The record does not indicate the derivation of this term.

it considers to be prohibited uses of the names or entities on the Orange List and makes the releasable information available to those who wish to purchase it. Without knowledge of the contents of the Orange List, no one can safely use the telephone directories in print form or the electronic format as databases from which to create marketing lists. This is so because the telephone directories contain the names of individuals whom it is illegal to solicit.

Despite the availability of cleansed data from Marketis, Teladresses or CD–ROM, Filetech has devised a strategy for copying the uncleansed electronic directory by using Minitel without incurring a charge.[3] France Telecom considers this use illegal under French unfair competition law because, in copying the electronic directory, Filetech (1) evades France Telecom's charges; and (2) creates a database that is not in compliance with the Data Processing Act and the regulations of the CNIL. Because the Orange List names are embedded in the electronic directory, Filetech cannot provide the required notice to French residents that their names are being used in its database, and Filetech cannot obtain the required certificate of acknowledgement from the CNIL for creation of the database. Finally, in copying the directory, Filetech inherently copies the organizing software, which France Telecom asserts is copyrighted material.

Complaining of its denial of access to the purged database, Filetech has commenced several legal proceedings in French courts. Some of the legal issues raised in the present case are raised in those proceedings.[4] In November of 1992, Filetech unsuccessfully sought an order from the Commercial Court of Paris requiring France Telecom S.A. to provide it with a copy of the Orange List, presumably so that it could purge the listed names from the directory of subscribers it had obtained from France Telecom S.A.'s electronic directory. Filetech's application was based, *inter alia,* on allegations of violations of French antitrust law on the part of France Telecom S.A. The following month,

the Conseil de La Concurrence, or the Council on Competition (the "Council"), a French regulatory agency comparable to the Federal Trade Commission in the United States, denied a similar request by Filetech, the Council having found that there was no evidence of irreparable harm to Filetech arising out of France Telecom S.A.'s refusal to provide a copy of the Orange List. At the time of briefing in the district court, the Council still had not decided Filetech's antitrust claims on the merits.

In January of 1994, the Commercial Court of Paris issued a judgment denying Filetech's request for an order requiring France Telecom S.A. either to disclose the Orange List to it or to "cleanse" Filetech's own list of telephone subscribers by removing the names contained on the Orange List. France Telecom has submitted an affidavit explaining the Commercial Court's ruling. According to France Telecom, the court held that French law prohibited disclosure of the Orange List as such to Filetech. Filetech appealed that order and, on February 20, 1995, the Court of Appeals in Paris issued an order staying the proceedings pending the outcome of criminal proceedings against Filetech and its Chief Executive Officer, Guy Birenbaum, arising out of Filetech's copying of France Telecom S.A.'s unpurged database.

In May of 1996, the Tribunal de Grande Instance de Nanterre, or the Criminal Court of Nanterre, acquitted Birenbaum and Filetech on the charge that they had violated the privacy rights of those individuals who asked to be placed on the Orange List, holding instead that Article R. 10–1 violated the antitrust provisions of the European Economic Community's Treaty of Rome. The Court of Appeals of Versailles, however, reversed the lower court's decision and convicted the two defendants of violating the French Penal Code by including on Filetech marketing lists the names of individuals who had placed themselves on the Orange List. The Court of Appeals concluded that the privacy rights of the individuals on the Orange List had in fact

---

**3.** Filetech has programmed its computers to take advantage of the three free minutes feature by switching its computers on and off at three-minute intervals until the entire electronic directory has been copied.

**4.** We rely primarily on the affidavits describing this litigation that were submitted by France Telecom and credited by the district court.

been violated. Birenbaum and Filetech have appealed, and the appeal before the Supreme Court of the Republic of France is pending.

Relevant to the present case is pending litigation involving Sophie Bargain, a woman who operates a direct marketing lists business in France and who has utilized the unpurged electronic directory of France Telecom S.A. in order to compile marketing lists. On February 6, 1996, the Rennes Court of Appeals affirmed a lower court's finding that Bargain was criminally liable for processing and selling names that her business had downloaded from the unpurged electronic telephone directory. Thereafter, Bargain sought an injunction to force France Telecom S.A. to turn over the Orange List to her. In an interim ruling, the Paris Court of First Instance determined that there were no grounds for issuing an injunction, and that France Telecom S.A. had legitimate grounds under French law for its refusal to provide Bargain with the Orange List. By ruling dated April 16, 1996, the Paris Court of Appeals upheld the decision of the lower court.

The conduct of France Telecom S.A. remains under scrutiny by the French courts. On September 13, 1996, an investigating magistrate in France indicted France Telecom S.A. on the following charges:

(1) For having misused the Orange List in a manner incompatible with its lawful objective, which is to protect from commercial solicitations the people who have put themselves on that list, and for turning it into a source of profit through Marketis and Teladresses, at prices that exclude all competition; and

(2) For having abused its dominant position in the relevant market by selling lists at prices that exclude all competition.

The outcome of that case remains in doubt. In sum, as far as this Court can tell, based in part on a lack of final decisions on the merits and on the seemingly conflicting dictates of French judicial and regulatory authorities, it remains unsettled in France what conduct is permissible on the part of France Telecom S.A. and Filetech S.A. with respect to the marketing lists business.

### III. *The Present Litigation*

On March 17, 1995, Filetech brought suit against France Telecom in the district court under Sections 2 and 7 of the Sherman Antitrust Act, seeking both treble damages and injunctive relief from France Telecom's alleged restraints on trade in the United States. In addition to money damages, Filetech sought an injunction requiring France Telecom S.A. to provide access to its electronic database, cleansed of the names on the Orange List, without having to pay the charges that one incurs in obtaining the data by using the Marketis, Teladresses or CD-ROM services. On June 5, 1995, France Telecom moved to dismiss Filetech's complaint, pursuant to Fed.R.Civ.P. 12(b), on the ground of international comity, and because the district court lacked subject matter jurisdiction under the FSIA and the Sherman Antitrust Act, as amended by the FTAIA.[5] On September 15, 1997, the district court dismissed Filetech's complaint. *See Filetech S.A.R.L. v. France Telecom,* 978 F.Supp. 464, 483 (S.D.N.Y.1997).

Although it considered "somewhat puzzling" the failure of France Telecom to first argue the absence of subject matter jurisdiction, the district court addressed the arguments in the order presented and therefore began its analysis by examining the issue of international comity. The court determined, on the basis of Supreme Court precedent and earlier cases in this Circuit, that (1) "a party seeking the dismissal of a Sherman Act case on the ground of international comity must first demonstrate that a true conflict exists between the Sherman Act and relevant foreign law"; and (2) "that, once the threshold barrier of conflict of law is passed, comity analysis in this circuit looks to the same factors described by the Ninth Circuit in the *Timberlane* cases and in the Restatement." *Id.* at 478. The *Timberlane* cases, *Timberlane Lumber Co. v. Bank of America,* 549 F.2d 597 (9th Cir.1976) ("*Timberlane I*"), *Timberlane Lumber Co. v. Bank of America,* 749 F.2d 1378 (9th Cir.1984) ("*Timberlane II*") and the Restatement (Third) of the

**5.** The motion was filed under Fed.R.Civ.P. 12(b) generally. France Telecom failed to specify the subsection of Rule 12(b) under which it was moving. *See Filetech S.A.R.L. v. France Telecom,* 978 F.Supp. 464, 472 n. 3 (S.D.N.Y.1997).

Foreign Relations Law of the United States § 403(2), adopted a seven-factor analysis to be applied in deciding whether international comity dictates that a court decline to exercise jurisdiction.

In concluding that a true conflict is present in this case, the district court determined that "[t]he most that can be said in the case at bar is that France Telecom has asserted a substantial claim that its conduct gives rise to a conflict between the requirements of the Sherman Act and of French law." *See File-tech*, 978 F.Supp. at 478. The court gave two reasons for this determination: (1) any conflict between the Sherman Act and French law "goes to the heart of the case, including, significantly, the propriety of this Court's enjoining France Telecom's conduct in ways that may violate French law and regulations," *id.*; and (2) it is more appropriate that the French courts declare the French law in the course of litigation being pursued in France. The district court then proceeded to apply the seven *Timberlane* factors,[6] concluding that the first factor alone required dismissal on the ground of comity, and further noting that "if that factor alone does not require that conclusion, it surely does when viewed in conjunction with other *Timberlane* factors." *Id.* at 481.

Turning briefly to the jurisdictional issues, the district court observed that the FSIA provides that a foreign state entity such as France Telecom S.A. is not immune from suit in the United States courts in actions based on commercial conduct that causes a direct effect in the United States. *Id.* at 483. It also observed that the FSIA requires that the nexus between the commercial activity and the cause of action asserted be a significant one. *Id.* As to Sherman Act subject matter jurisdiction, the district court noted that, in accordance with the provisions of the FTAIA, it must be shown that the foreign conduct was meant to produce and does produce a substantial effect in this country. *Id.*

at 483. Denying the motion to dismiss on jurisdictional grounds, the district court concluded as follows:

On this motion to dismiss on these particular grounds, I look only to the complaint, to determine whether Filetech "has made the minimal allegations about the impact on competition in the United States necessary to state a claim for a Sherman Act violation," *Metro Industries*, 82 F.3d at 847, an analysis that also applies to the FSIA issue. While Filetech's allegations are sparse and largely conclusory, I think that they meet that undemanding standard.

*Id.*

Filetech appeals from the judgment entered on the opinion of the district court dismissing its Sherman Act claims on the ground of international comity. France Telecom cross-appeals from so much of the judgment as denies dismissal for lack of subject matter jurisdiction, contending (1) that the district court erred in refusing to consider materials outside the complaint; and (2) that the record supports dismissal under the FSIA and FTAIA.

**DISCUSSION**

■ We are duty-bound, as was the district court, to address the issue of subject matter jurisdiction at the outset. The Supreme Court has set forth this duty in the following terms:

"On every writ of error or appeal, the first and fundamental question is that of jurisdiction, first, of this court, and then of the court from which the record comes. This question the court is bound to ask and answer for itself, even when not otherwise suggested, and without respect to the relation of the parties to it." *Great Southern Fire Proof Hotel Co. v. Jones*, ... 177 U.S. [449,] 453, 20 S.Ct. [690,] 691–692 [44

6. The Ninth Circuit has defined these factors as follows:

[T]he degree of conflict with foreign law or policy, the nationality or allegiance of the parties and the locations or principal places of business of corporations, the extent to which enforcement by either state can be expected to achieve compliance, the relative significance of effects on the United States as compared with those elsewhere, the extent to which there is explicit purpose to harm or affect American commerce, the foreseeability of such effect, and the relative importance of the violations charged of conduct within the United States as compared with conduct abroad.

*Metro Indus. v. Sammi Corp.*, 82 F.3d 839, 846 (9th Cir.1996) (quotation omitted).

L.Ed. 842] [ (1900)]. The requirement that jurisdiction be established as a threshold matter "spring[s] from the nature and limits of the judicial power of the United States" and is "inflexible and without exception." *Mansfield, C. & L.M.R. Co. v. Swan,* 111 U.S. 379, 382, 4 S.Ct. 510, 511, 28 L.Ed. 462 (1884).

*Steel Co. v. Citizens for a Better Env't,* —— U.S. ——, 118 S.Ct. 1003, 1012, 140 L.Ed.2d 210 (1998) (fourth alteration in original). Although the district court failed to deal with the issues of FSIA and FTAIA jurisdiction at the outset of its analysis, it ultimately concluded that jurisdiction was established in this case. The standard of review established for district court decisions regarding subject matter jurisdiction is clear error for factual findings and *de novo* for legal conclusions. *See ConnTech Dev. Co. v. University of Connecticut Educ. Properties,* 102 F.3d 677, 681 (2d Cir.1996).

"[T]he FSIA provides the sole basis for obtaining jurisdiction over a foreign state in federal court...." *Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 439, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989). It is undisputed that France Telecom S.A. and FTI, the defendants in this case, are foreign states within the meaning of the FSIA. *See* 28 U.S.C. § 1603(a) ("[A] 'foreign state' ... includes ... an agency or instrumentality of a foreign state ....."); *see also Brink's Ltd. v. South African Airways,* 93 F.3d 1022, 1026 n. 4 (2d Cir.1996). Although the FSIA provides that a "foreign state shall be immune from the jurisdiction of the courts of the United States and of the States," 28 U.S.C. § 1604, it does allow for the exercise of such jurisdiction in cases that fall within the several statutorily defined exceptions. The exception upon which Filetech relies is the "commercial activity" exception, and it provides that a foreign state is not immune from suit in any case

in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of

the foreign state elsewhere and that act causes a direct effect in the United States. *Id.* § 1605(a)(2).

Invoking the commercial activity exception in its complaint, Filetech alleges that "France Telecom [S.A.], either directly or indirectly through France Telecom Inc., engages in substantial commercial activity in the United States, including the one upon which this action is based." The complaint also includes an allegation that "actions undertaken in France [by France Telecom S.A.] against [Filetech S.A.] in connection with commercial activity in France causes [sic] a direct effect in the United States."

■ Accordingly, Filetech first contends that its action "is based upon a commercial activity carried on in the United States by [a] foreign state," 28 U.S.C. § 1605(a)(2), which the FSIA defines as "commercial activity carried on by such state and having substantial contact with the United States." *Id.* § 1603(e). In order to sustain jurisdiction on this basis, "something more than a mere connection with, or relation to, commercial activity" must be shown. *Saudi Arabia v. Nelson,* 507 U.S. 349, 358, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993). Indeed, we "have required a *significant nexus* exist between the commercial activity in this country upon which the exception is based and a plaintiff's cause of action." *NYSA–ILA Pension Trust Fund v. Garuda Indonesia,* 7 F.3d 35, 38 (2d Cir.1993) (emphasis supplied). According to the Supreme Court, the "action must be 'based upon' some 'commercial activity' by [defendants] that had 'substantial contact' with the United States within the meaning of the Act." *Nelson,* 507 U.S. at 356, 113 S.Ct. 1471.

■ By virtue of its complaint allegations, Filetech also contends that its action is based upon France Telecom S.A.'s "act[s] outside the territory of the United States in connection with [its] commercial activity ... elsewhere ... [that] cause[ ] a direct effect in the United States." 28 U.S.C. § 1605(a)(2). It is well settled that "[a]cts are 'in connection' with ... commercial activity so long as there is a 'substantive connection' or a 'causal link' between them and the commercial activity."

*Hanil Bank v. PT. Bank Negara Indonesia,* 148 F.3d 127, 130 (2d Cir.1998).

■ Although the Supreme Court admonishes that the requisite direct effect need not be substantial or foreseeable, it also teaches that "the generally applicable principle de minimis non curat lex ensures that jurisdiction may not be predicated on purely trivial effects in the United States." *Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 618, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992). The Court noted with approval that in *Weltover, Inc. v. Republic of Argentina,* 941 F.2d 145, 152 (2d Cir.1991) we had "recognized [that] an effect is 'direct' if it follows 'as an immediate consequence of the defendant's ... activity.' " *Weltover, Inc.,* 504 U.S. at 618, 112 S.Ct. 2160. We also recognize a "legally significant acts" test in this Circuit. This test requires that the conduct having a direct effect in the United States be legally significant conduct in order for the commercial activity exception to apply. *See Hanil Bank,* 148 F.3d at 133; *see also Antares Aircraft, L.P. v. Federal Republic of Nigeria,* 999 F.2d 33, 34–35 (2d Cir.1993).

Similarly, the FTAIA forbids the exercise of jurisdiction over Sherman Act violations relating to foreign trade or commerce, other than import trade or commerce, unless the conduct complained of has a "direct, substantial, and reasonably foreseeable effect" on domestic or import commerce. 15 U.S.C. § 6a(1)(A). The Supreme Court found it unnecessary to invoke this statutory provision in finding Section One Sherman Act jurisdiction with respect to allegations that foreign insurers had engaged in unlawful conspiracies affecting the United States insurance market, noting that "it is well established by now that the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some *substantial effect* in the United States." *Hartford Fire Ins. Co. v. California,* 509 U.S. 764, 796, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993) (emphasis supplied). Especially pertinent to our discussion here is the statement in *Hartford* of the Court's "general understanding that the Sherman Act covers foreign conduct producing a substantial intended effect in the United States, *and* that concerns of comity come into play, if at all, only after a court has determined that the acts complained of are subject to

Sherman Act jurisdiction." *Id.* at 797 n. 24, 113 S.Ct. 2891 (emphasis supplied).

The First Circuit likewise refrained from applying the provisions of the FTAIA when it determined that there was jurisdiction over a Japanese corporation in a criminal prosecution charging conspiracy to fix prices of facsimile paper sold in the United States in violation of Section One of the Sherman Act. *See United States v. Nippon Paper Indus.,* 109 F.3d 1, 2 (1st Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998). Applying "caselaw [that] now conclusively establishes that civil antitrust actions predicated on wholly foreign conduct which has an intended and substantial effect in the United States come within Section One's jurisdictional reach," the First Circuit found the requisite intended and substantial effect. *Id.* at 4.

■ It appears to us that the case at bar presents substantial and unresolved questions in regard to jurisdiction over France Telecom under the FSIA, the FTAIA and the caselaw governing Sherman Act jurisdiction. The pleadings and submissions on the motion to dismiss in the district court, and the briefs and oral arguments in this court, demonstrate the existence of these questions. For example, Filetech claims that "France Telecom has made its database [containing the names of its subscribers] available through the Internet in 126 cities throughout the United States." It claims that anyone in these cities can call a local number and gain access to Minitel. Filetech refers to an affidavit that it has submitted stating that a person seeking access to the purged lists in this manner need not dial a French telephone number. More to the point, Filetech claims that France Telecom markets internet access to its databases here in the United States and otherwise engages in significant marketing activities.

To the contrary, according to the submissions of France Telecom, it is no longer possible to utilize the database through the Internet without a telephone account in France. As for sales in the United States, France Telecom admits to only two sales of its purged lists through Teladresses and fourteen uses of its Marketis service (includ-

ing six by France Telecom or affiliates) during a period of two years prior to the motion to dismiss. The revenue from Teladresses usage was $3,500 in 1993, represented by one billing. There were no billings for this service in 1994. France Telecom further asserts that it engages in no activities in the United States designed to attract American customers for its marketing list business. Most of the subscribers to Minitel in the United States are French individuals and businesses and French government agencies located here. Although France Telecom markets a specially formatted CD–ROM directory, it has sold none in the United States and does not intend to offer it for sale here. France Telecom, in effect, contends that its commercial activities in the United States are *de minimis*.

■ In view of the foregoing factual disputes, it was error for the district court to accept the mere allegations of the complaint as a basis for finding subject matter jurisdiction. The district court "look[ed] only to the complaint" in making its determination. It did so despite the factual issues regarding jurisdiction that were presented to it. In these circumstances, the court should have looked outside the pleadings to the submissions, which both contradicted and supported the bare allegations of jurisdiction pleaded in the complaint. Our rule is that, on a "challeng[e][to] the district court's subject matter jurisdiction, the court may resolve disputed jurisdictional fact issues by reference to evidence outside the pleadings, such as affidavits." *Antares Aircraft, L.P. v. Federal Republic of Nigeria,* 948 F.2d 90, 96 (2d Cir. 1991).

We have identified a number of factual issues bearing on the question of subject matter jurisdiction that need to be resolved on remand. The district court should consider all the submissions of the parties and may hold an evidentiary hearing, if it considers that such a hearing is warranted, in resolving the question of jurisdiction. Before arriving at its legal conclusion regarding the existence *vel non* of subject matter jurisdiction, the district court should resolve the disputed factual matters by means of findings of fact.

■ In view of the foregoing, we need not, and we do not, approve or disapprove of the district court's analysis or application of the doctrine of international comity, except to the limited extent that follows. We here note our disagreement with the court's conclusion that there is a true conflict between French law and United States law. There is as yet no basis for such a conclusion in the record. "[W]hat [i]s required to establish a true conflict [i]s an allegation that compliance with the regulatory laws of both countries would be impossible." *In re Maxwell Communication Corp.,* 93 F.3d 1036, 1050 (2d Cir.1996).

■ In the first place, the district court found only that France Telecom had "asserted a substantial claim" of true conflict. A "substantial claim" is insufficient; a conflict must be clearly demonstrated. Secondly, the court's true conflict determination was grounded in findings: (1) that if there were a conflict, it would "go[ ] to the heart of the case" including the propriety of an injunction violative of French law; and (2) that it would be "more appropriate" for French law to be declared by French courts. These findings are insufficient to demonstrate any apparent conflict of laws. To date, there is nothing in the record in the district court to justify the legal conclusion that compliance with the regulatory laws of both France and the United States would be impossible. In any event, the district court need not address the issue of international comity unless it resolves the question of subject matter jurisdiction in favor of Filetech.

## CONCLUSION

The judgment of the district court is vacated, and the case is remanded for further proceedings consistent with the foregoing.