Eileen BROTMAN and Aaron Brotman, Plaintiffs,

v.

The UNITED STATES of America, and The Statue of Liberty Ellis Island Foundation, Inc., Defendants.

No. 99 Civ. 8695(RWS).

United States District Court, S.D. New York.

Sept. 5, 2000.

Simon & Newman, Forest Hills, NY, by Keith A. Gilman, of counsel, for plaintiffs.

Honorable Mary Jo White, United States Attorney for the Southern District of New York, New York City, by Andrew W. Schilling, Assistant U.S. Attorney, of counsel, for defendants.

## OPINION

SWEET, District Judge.

Defendant the United States of America (the "Government") seeks an order ·dismissing the complaint in this action as against the Government for lack of subject matter jurisdiction pursuant to Federal

Rule of Civil Procedure 12(h)(3). The motion is opposed by plaintiffs Eileen Brotman ("Mrs.Brotman") and Aaron Brotman ("Mr.Brotman") (collectively, the "Brotmans").

For the reasons set forth below, the motion will be granted.

### The Parties

The Brotmans are individuals residing in Nassau County, New York.

The Government at all relevant times owned, managed, and operated certain lands and premises known as the Statue of Liberty National Monument, Liberty Island, New York, including the stairways.

The Statue of Liberty Ellis Island Foundation, Inc. (the "Foundation") is a corporation organized and existing under the laws of New York which at all relevant times operated and managed said lands and premises, including the stairways thereat.

### Prior Proceedings

The complaint in this personal injury action was filed on August 6, 1999. In this action the Brotmans seek to recover damages for the alleged negligence of the Government—specifically, employees of the National Park Service ("NPS")—and the Foundation. The basis asserted for jurisdiction over the claims against the Government is the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b) *et seq.* The basis asserted for jurisdiction over the claims against the Foundation is supplemental jurisdiction, pursuant to Federal Rule of Civil Procedure 1367.

The instant motion was filed on February 29, 2000, and oral argument was heard on May 3, 2000, at which time the matter was deemed fully submitted.

### Facts

▬ The following facts are derived from the pleadings, declarations, and exhibits submitted by the parties, as is appropriate in deciding a motion to dismiss for lack of subject matter jurisdiction.[1] *See Filetech S.A. v. France Telecom S.A.,* 157 F.3d 922, 932 (2d Cir.1998) ("on a 'challeng[e][to] the district court's subject matter jurisdiction, the court may resolve disputed jurisdictional fact issues by reference to evidence outside the pleadings' ") (*quoting Antares Aircraft, L.P. v. Federal Republic of Nig.,* 948 F.2d 90, 96 (2d Cir. 1991), vacated on other grounds, 505 U.S. 1215, 112 S.Ct. 3020, 120 L.Ed.2d 892 (1992)). The burden of proving subject matter jurisdiction is on the party asserting it. *See e.g., Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 507 (2d Cir.1994). Thus, argumentative inferences favorable to the party asserting jurisdiction have not been drawn. *See Atlantic Mutual,* 968 F.2d at 198. The material factual allegations presented in the complaint are also included herein and are accepted as true for purposes of this motion. *See id.* at 198; *Lefrak v. United States,* No. 94 Civ. 7668, 1996 WL 420308, at *1 (S.D.N.Y. July 26, 1996).

The Statue of Liberty was declared a National Monument in 1924, and has been listed in the National Register of Historic Places maintained by the Secretary of the Interior since 1966.

The interior of the Statue of Liberty was not originally intended for public visitation. Public access was first accommodated in the late 1800's by means of wooden stairs and ladders. Metal stairs, including the extant double-spire staircase, were installed around the turn of the century. The statue was rehabilitated for the first time in the 1930's in order to accommodate an increasing number of visitors. At that

---

1. The Government's motion is brought pursuant to Rule 12(h)(3), rather than Rule 12(b)(1), because the Government has answered the complaint. *See* Fed.R.Civ.P. 12(h)(3) (providing for dismissal "whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter"). However, motions to dismiss under the two rules are subject to the same standards. *See Peterson v. Continental Airlines, Inc.,* 970 F.Supp. 246, 248–49 (S.D.N.Y.1997).

time, corridors were tunneled into the concrete of the statue's pedestal and larger stairs installed within it.

In 1982 the NPS and the Foundation commenced a project (the "1980's Project") to rehabilitate the Statue of Liberty National Monument. This project was completed in 1986. The Statue of Liberty was reopened to the public on July 5, 1986.

Because the Statue of Liberty National Monument is listed in the National Register of Historic Places, the 1980's Project was governed by the Secretary of the Interior's Standards for the Treatment of Historic Preservation Projects (the "Standards"). The Standards, which are promulgated pursuant to the National Historic Preservation Act, 16 U.S.C. § 470, apply to inter alia historic properties owned by the Government.

The Standards apply to all "treatments," i.e., preservation, rehabilitation, restoration, and reconstruction, undertaken on National Register properties. *See* 36 C.F.R. § 68.3 (1984).[2] Rehabilitation "[m]eans the act or process of returning a property to a state of utility through repair or alteration that makes possible an efficient contemporary use while preserving those portions or features of the property that are significant to its historical, architectural, and cultural values." 36

C.F.R. § 68.2(e) (1984). Under the Standards "any treatment must be consistent with the historic character of the structure," 36 C.F.R. § 68.3.

A Declaration submitted by the NPS Project Architect for the 1980's Project, John Robbins ("Robbins"), explains the nature of the project and considerations it entailed.[3] The 1980's Project was considered a rehabilitation by NPS because the project left the original statue and pedestal largely intact, and focused on preserving the historic character of the statue and pedestal while at the same time making repairs, alterations, and additions to accommodate increased visitation. The structural features of the interiors of the pedestal and the statue, including the metal and concrete stairs, the lighting, the walls, and the finishes were considered historic for the purpose of the 1980's Project, whether they were part of the original design and construction or had been previously modified during the 1930's rehabilitation project or the intervening years.

The lighting conditions within the statue and pedestal are not now and were not historically uniform. The level of lighting at any particular location is a function of a number of factors, including the amount of natural light coming in, the placement of

2. The Brotmans contend that the 1980's Project could not have entailed a "rehabilitation" because the version of the Standards submitted by the Government, which identify rehabilitation as one of four possible treatments, was published in 1995. However, the Standards in place during the mid–1980's identify the same four "treatments," including rehabilitation, as does the 1995 version. *Compare* 36 C.F.R. § 68.3 (1995) *with* 36 C.F.R. § 68.3 (1984). In addition, although the evidence shows that the 1980's Project was a rehabilitation, it is actually immaterial to the question of subject matter jurisdiction which of the four treatments was involved. That is, there is no legally significant difference among the standards with respect to the issues relevant to disposition of the Government's motion, including specifically the provisions relating to the importance historical accuracy and preservation. *Compare* 36 C.F.R. § 68.3 (1984) (general standards) *with* 36 C.F.R.

§ 68.4 (1984) (specific standards for inter alia preservation, rehabilitation, restoration, and reconstruction projects).

3. The Brotmans challenge Robbins' "credibility," but submit no evidence of their own to contradict his description of the project. Absent contrary, competent evidence, Robbins' credibility is not at issue. The Brotmans also contend that the Court should not rely on Robbins' "word" as to what was deemed historical and what policies were being followed during the 1980's Project. The Declaration of the 1980's Project architect, however, signed under penalty of perjury, is a competent form of evidence on such matters. *See Chantal*, 104 F.3d 207, 212 (8th Cir.1997) (considering sworn statements of NPS engineer and park historian in determining that design of steps at historic site was chosen to aesthetically complement other features of the site).

light fixtures, the use of spotlights to highlight significant structural elements, and the color of the interior surfaces, which is a dark grey and reflects less light than would a lighter color.

The lighting conditions within the pedestal were considered adequate for visitation prior to the 1980's Project. Although some alterations and additions were made as part of the 1980's Project in order to accommodate an increased number of visitors, the replacement stairs, light fixtures, and finishes were designed to be consistent with the character of the interiors as they existed prior to the 1980's Project. The decision to be consistent with the historic character of the statue and pedestal interiors was made in light of the Standards.

In addition to the Standards, other relevant agency materials are the Management Policies, National Park Service (the "Management Policies") and the Cultural Resources Management Guidelines, National Park Service (the "Management Guidelines").

On March 2, 1988, the Brotmans visited the Statue of Liberty along with their son and daughter-in-law. The group, having visited the crown of the statue, decided to descend by walking down the metal staircase within the pedestal because there was a line for the elevator. Mrs. Brotman was the last of the four, who proceeded down the stairs single-file. After descending more than one flight of stairs and proceeding at a normal pace for "five to eight minutes," Mrs. Brotman missed the final step before a landing and fell onto the landing. Specifically, while her right foot was on the penultimate step before the landing, her left foot accidentally missed the last step, causing her to fall.

The Brotmans allege that there was a sudden drop-off in the amount of lighting provided at the point in the stairwell where Mrs. Brotman fell, that the lighting at that point was insufficient, and that she fell because she could not see the final step before the landing due to the insufficient

lighting. They also allege that there was no warning sign posted at the location of her fall. They do not claim that any existing light fixtures were turned off, broken, or not functioning properly but, rather, that the problem was the lighting design.

## Discussion

### I. *The FTCA And The Discretionary Function Exception*

The United States is immune from suit except as it consents to be sued. *See United States v. Mitchell,* 463 U.S. 206, 210–211, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). Thus, consent is a prerequisite for subject matter jurisdiction in the federal courts. *See Mitchell,* 463 U.S. at 212, 103 S.Ct. 2961; *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941).

The FTCA is a limited waiver of the federal government's sovereign immunity. *See United States v. Orleans,* 425 U.S. 807, 813, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976). Pursuant to the FTCA, the United States shall be liable, to the same extent as a private party, for damages:

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment.

28 U.S.C. § 1346(b).

This waiver of sovereign immunity is subject to a number of exceptions. *See* 28 U.S.C. § 2680. One of these is the discretionary function exception, pursuant to which the government has not consented to be sued on:

> [a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).

If a claim falls within this exception, the court lacks jurisdiction to entertain it.

*See, e.g., Fazi v. United States,* 935 F.2d 535, 537 (2d Cir.1991) (*citing Dalehite v. United States,* 346 U.S. 15, 30–36, 73 S.Ct. 956, 97 L.Ed. 1427 (1953)).

■ The discretionary function exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *United States v. Varig Airlines,* 467 U.S. 797, 808, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). Its purpose is "to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic and political policy through the medium of an action in tort." *Id.* at 814, 104 S.Ct. 2755.

■ The determination as to whether the discretionary function exception applies in a particular case involves a two-part inquiry. *See United States v. Gaubert,* 499 U.S. 315, 328–32, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991); *Berkovitz v. United States,* 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). The first question is whether the challenged governmental conduct was discretionary. *Berkovitz,* 486 U.S. at 536, 108 S.Ct. 1954. If there is a federal statute, regulation, or policy that dictates a specific course of action for a government employee to follow "then there is no discretion in the conduct for the discretionary function exception to protect." *Id.* at 536, 108 S.Ct. 1954. However, where the applicable rules permit the employee to exercise "judgment or choice" then by definition there is room for discretion on the part of that employee. *Gaubert,* 499 U.S. at 322, 111 S.Ct. 1267 (internal quotation and citation omitted).

■ The second question is whether, if the conduct was discretionary, that conduct is "based on considerations of public policy." *Berkovitz,* 486 U.S. at 537, 108 S.Ct. 1954 (citation omitted). This part of the inquiry is not focused on the subjective intent of the government official or employee in exercising her discretion but, rather, is focused "on the nature of the actions taken and on whether they are susceptible to policy analysis." *Gaubert,* 499 U.S. at 325, 111 S.Ct. 1267; *see also Shansky v. United States,* 164 F.3d 688, 691 (1st Cir.1999) (citations omitted). Moreover if, pursuant to federal statute, regulation, or agency guidelines, a government official or employee is permitted discretion, then there is a presumption that the exercise of that discretion implicates policy judgments. *See Gaubert,* 499 U.S. at 324, 111 S.Ct. 1267; *Fazi,* 935 F.2d at 538 (citations omitted).

## II. *The Discretionary Function Exception Applies To The Brotmans' FTCA Claim*

### A. *The Conduct Is Discretionary*

■ The NPS sought in the 1980's Project to preserve the historic character of the Statue of Liberty, including the interior of the pedestal, while at the same time making repairs, alterations, and additions directed at accommodating an increased number of visitors. The lighting conditions throughout the interior, and at any given point, are the product of multiple factors, including the amount of outdoor light coming in, the placement of any light fixtures, the use of spotlights to highlight significant structural elements, and the gray paint used on the interior surfaces. The NPS installed replacement stairs, light fixtures, and finishes, but designed them to be consistent with the character of the interiors as they existed prior to the 1980's Project. One of the aspects of the lighting which existed before the 1980's Project and which continued thereafter was its non-uniformity and the fact that it is significantly darker at some points in the pedestal than at others.

The Brotmans have the burden of showing that the challenged action of NPS was not discretionary but was instead "controlled by mandatory statutes or regulations." *Gaubert,* 499 U.S. at 328, 111 S.Ct. 1267. In this regard the Brotmans point

to a clause contained within the Management Policies which provides that:

> Requirements of structural preservation, protection of historic fabric and contents and public safety take primacy over all uses of historic structures. All prudent measures shall be taken to protect the safety of the public using historic structures, but public use shall not be permitted if provisions for safety necessitate significant alterations compromising the visual integrity of the structure.

Management Policies at V–23.

According to the Brotmans, this provision left the NPS no room for judgment or choice in designing the pedestal interior lighting but, rather, mandated that safety concerns take priority over all considerations relating to historical preservation.

This argument fails for two reasons. First, the provision cited by the Brotmans does not dictate that safety concerns be elevated above concerns of historical accuracy. Rather, it identifies three concerns, namely, preservation, protection of historic fabric, and public safety, which together "take primacy over all uses of historic structures." Second, the provision sets forth a general statement of policy goals rather than dictating specific measures. Thus, the provision affords discretion to NPS in determining what measures to take towards effectuating those goals.

Similarly, the statement that "all prudent measures shall be taken" leaves it to the discretion of the NPS to determine which measures are "prudent" and which shall be undertaken. The Management Policies "do[ ] not specifically prescribe that any particular safety measure be employed at any particular place." *Shansky,* 164 F.3d at 691 (NPS operating manual provision that "[t]he saving of human life will take precedence over all other management actions" did not take NPS decision not to install handrail at National Historic site out of discretionary function exception); *see also DiBartolo v. United States,* No. 95 Civ. 3182, slip op. at 9 (D.N.J.1996) (NPS decision not to use slip-resistant paint on Ellis Island museum stairs within discretionary function exception where plaintiff "pointed to no applicable statute, regulation or policy indicating the type of paint to be used on stairs at NPS monuments and historical structures").

The Brotmans also point to a provision in the 1997 version of the Cultural Resources Management Guidelines, National Park Service (the "1997 Management Guidelines"), in which appears a provision that:

> [W]hen existing or proposed uses of structures present safety ... problems, and when solutions to such problems would unacceptably compromise their historical integrity or character, the uses should be changed or limited.

1997 Management Guidelines at 125.

This provision does not aid the Brotmans, however, because by its own terms this provision permits the exercise of discretion on the part of the NPS. For example, it is left to NPS employees to judge whether "safety and security problems" would "unacceptably" compromise historical integrity, and whether or how to "change" or "limit" the use of a given structure. The Brotmans have not met their burden to demonstrate a specific statute, regulation, or policy directed at the particular conduct challenged. *See, e.g., Shansky,* 164 F.3d at 691; *DiBartolo,* 95 Civ. 3182, slip. op. at 9.

The Brotmans also aver that NPS had no discretion to act as it did because, once it decided to act, it became subject to liability for negligence in execution of that act. However, the cases cited by the Brotmans in this regard, *Indian Towing Co. v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), and *Caraballo v. United States,* 830 F.2d 19 (2d Cir.1987), involved scenarios that are legally distinct from the circumstances herein. Both cases concerned situations where the Government had decided to institute a specific practice and was then liable for its failure

to exercise due care in executing that practice. In *Indian Towing,* the Government installed a light house but then failed to maintain the light in working order, *see* 76 S.Ct. at 126–27, while in *Caraballo* the Government undertook to provide all-inclusive beach patrols and then failed to carry out those patrols diligently, *see* 830 F.2d at 21. The equivalent situation in this case would be if the lights which NPS chose to install were turned off, broken, or malfunctioning at the time and location of Mrs. Brotman's fall. That, however, is not the nature of the Brotmans' claim. Rather, their complaint is with the choices made by NPS in its design of the lighting inside the Statue of Liberty pedestal, which included non-uniformity and, indeed, areas where there is significantly less light than in others, in order to reflect the conditions as they existed historically inside the monument.

■ Finally, the Brotmans contend that NPS had no discretion not to post a warning sign in the area where Mrs. Brotman fell because NPS had decided to post other signs in certain places within the pedestal interior. Even assuming arguendo that the pedestal interior was, as the Brotmans put it, "riddled with safety signs and indicators," this argument fails.[4] A decision to post warning signs in certain areas would not deprive the NPS of its discretion as to whether or where to post other signs. *See Shansky,* 164 F.3d at 691 (NPS decision to install safety devices in some parts of historic site and not others was discretionary because such decision involved "balancing competing considerations and opting for safety over authenticity in some applications, but not in others").

In sum, the NPS decision as to the lighting conditions within the pedestal is indistinguishable from other types of governmental decisions relating to historic sites which have been held to fall within the discretionary function exception. *See*

*Shansky,* 164 F.3d at 691 (NPS decision not to install handrails at National Historic site was discretionary); *Chantal,* 104 F.3d at 211 (design of steps at National Historic site involved discretion); *DiBartolo,* slip op. at 9 (NPS choice of paint used on stairs of Ellis Island museum was discretionary). Therefore, the first prong of the discretionary function test is satisfied.

### B. *The Conduct Is Susceptible To Policy Analysis*

■ As explained above, where the relevant federal statute, regulation, or agency guidelines permits for the exercise of discretion by a government official or employee then there is a presumption that the exercise of that discretion implicates policy judgments. *See Gaubert,* 499 U.S. at 324, 111 S.Ct. 1267. The Brotmans have failed to rebut this presumption.

The Brotmans contend the challenged conduct was not grounded in policy considerations because, in their view, preservation of the historic character of the pedestal interior would not have been adversely affected by installing an additional light or a warning sign at or near the location where Mrs. Brotman fell. This argument is misplaced, however, because it goes to the merits of the Government's decision as to the design of the interior lighting, or the posting of signs, rather than to the threshold question of subject matter jurisdiction. The issue is whether the Government's discretionary decision was susceptible to policy analysis, not whether it was negligent in the decision it ultimately made—let alone the quality of its assessment as to what was needed to preserve historic character. *See, e.g., Sea–Land Service, Inc. v. United States,* 919 F.2d 888, 892 (3d Cir. 1990) ("This argument confuses negligence with immunity; the government may be negligent but nevertheless immune from tort liability."); *Davis v. United States,* 918 F.Supp. 368, 372 ("[O]nce the court

4. The evidence submitted by the Brotmans, consisting of photographs of the statue interior, shows signs directing the flow of visitor traffic rather than "warning" or "safety" signs.

finds government activity is discretionary, it is irrelevant whether the government was in fact negligent in exercising that discretion."); *DiBartolo,* slip. op. at 8 (allegation that government negligent not relevant to either prong of immunity analysis) (citation omitted).

By statute, the mission of the NPS is: [T]o promote and regulate the use of ... national parks, monuments, and reservations ... by such means and measures as conform to the fundamental purpose of said parks, monuments, and reservations, which purpose is to conserve the scenery and the natural and historic objects ... therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

16 U.S.C. § 1.

Consistent with this broad mandate, the Secretary of Interior's Standards relating to treatments of historic properties, including rehabilitation, provide that "any treatment must be consistent with the historic character of the structure." 36 C.F.R. § 68.3 (1984).

The evidence shows that the repairs, alterations, and additions made to the interior of the Statue of Liberty pedestal, including the design of the lighting, were made with the goal of preserving the historic character of the interiors while at the same time accommodating increased visitors. With respect to the lighting specifically, NPS sought to obtain a result that reflected the conditions existing prior to the 1980's Project, conditions which included non-uniformity in lighting and a significant lack of lighting in certain areas.

The decisions involved in the design of the lighting—and in whether and where to post warning signs—in the Statue of Liberty pedestal involved the weighing of safety concerns as compared with aesthetic ones and the impact of any changes on the historical accuracy of the rehabilitation. This type of decision is not only grounded in policy concerns but, indeed, "typifies the kind of governmental decisions which Congress intended to shield from judicial second-guessing." *Chantal,* 104 F.3d at 212 (citations omitted) (design of steps at national monument involved balancing of safety as against "aesthetic effect on ... overall design and historic significance" and therefore was grounded in policy concerns); *see also Shansky,* 164 F.3d at 693 (decision no to provide handrails at historic site involved balancing of safety concerns with aesthetic ones and therefore was susceptible to policy analysis); *DiBartolo,* slip op. at 3–4 (decision to apply certain paint to Ellis Island museum stairs was policy based because paint chosen with intent of preventing deterioration of "character-defining" cast-iron stairs).

■ The Brotmans also contend that there is a safety exception to the discretionary function doctrine. Thus, they aver, first, that a failure to warn does not fall within the discretionary function exception, and, second, that the Government must take "reasonable steps" to minimize the risk of personal injury. However, there is no "generalized 'safety exception' " to the discretionary function doctrine. *Shansky,* 164 F.3d at 693; *see DiBartolo,* slip op. at 14–16 (collecting cases holding that failure to warn was within discretionary function exception). Nor does the Second Circuit case cited by the Brotmans, *Andrulonis v. United States,* 952 F.2d 652 (2d Cir.1991) support a different conclusion. In *Andrulonis,* the court held that there was nothing in the policy scheme of the Centers for Disease Control which could support the decision of a government scientist not to warn laboratory workers of an easily-avoidable risk of contracting rabies through their work. In that situation, the government employee's decision "[could] not be said to based on the purposes the regulatory regime seeks to accomplish," namely, of eradicating rabies. 952 F.2d at 655 (*quoting Gaubert,* 499 U.S. at 325 n. 7, 111 S.Ct. 1267).

In this case, by contrast, there are identifiable policy concerns, including safety on

the one hand as compared with aesthetics and historical accuracy on the other, which the NPS is given the discretion to weigh in making a decision such as how much and what kind of lighting to provide within the Statue of Liberty Monument. The same is true for the posting of warning signs, which can affect the historic character of a structure or park. *See Shansky,* 164 F.3d at 693 (discussing effect of warning signs on historic character); *DiBartolo,* slip op. at 13 (collecting cases). The challenged conduct herein was thus squarely within the purposes of the relevant regulatory regime.

Therefore, whether or not the Government was negligent in its exercise of discretion as to the design of the lighting or the lack of warning signs within the Statue of Liberty pedestal, those decisions are not subject to "second-guessing" by this Court, and the claims against the Government must be dismissed for lack of subject matter jurisdiction. *Varig Airlines,* 467 U.S. at 818, 104 S.Ct. 2755.

■ A district court may decline supplemental jurisdiction when it dismisses all claims over which it has original jurisdiction. *See* 28 U.S.C. § 1367(c)(3). Since the parties are at an early stage of the case and the federal claims have been dismissed, leaving no independent basis of jurisdiction over the remaining state claims brought against the Foundation, the claims against the Foundation are also dismissed. *See Purgess v. Sharrock,* 33 F.3d 134, 138 (2d Cir.1994); *Modeste v. Local 1199,* 850 F.Supp. 1156, 1167 (S.D.N.Y. 1994).

## Conclusion

Therefore, for the reasons set forth above, the Government's motion to dismiss for lack of subject matter jurisdiction is granted. The complaint in this action is dismissed as to all defendants.

It is so ordered.