**Nettie SHANSKY, Plaintiff, Appellant,**

v.

**UNITED STATES of America, Defendant, Appellee.**

**No. 98–1658.**

United States Court of Appeals, First Circuit.

Heard Dec. 10, 1998.

Decided Jan. 8, 1999.

Frank Verderame, with whom Laurence G. Tinsley, Jr. and Plattner Verderame, P.C. were on brief, for appellant.

Mary Elizabeth Carmody, Assistant United States Attorney, with whom Donald K. Stern, United States Attorney, was on brief, for appellee.

Before SELYA, Circuit Judge, GIBSON,[*] Senior Circuit Judge, and LIPEZ, Circuit Judge.

SELYA, Circuit Judge.

This appeal requires us to revisit the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671–2680, and, in particular, its discretionary function exception, 28 U.S.C. § 2680(a). We conclude that the district court applied the exception impeccably and appropriately granted summary judgment on that basis.

The facts, insofar as they pertain to the issues on appeal, are uncomplicated. Upon departing the Hubbell Trading Post, a national historic site in Ganado, Arizona, through the so-called "Northern Exit," plaintiff-appellant Nettie Shansky tripped over an antique wooden threshold and tumbled down a short flight of steps. She sustained serious personal injuries in the fall.

The Trading Post was originally built in the late 1800s. The National Park Service acquired it in 1967 and rehabilitated it three years later with a view toward preserving its authenticity.[1] Shansky maintains that, when the Park Service refurbished the Trading Post, it should have installed a handrail at the Northern Exit. She brought an FTCA suit against the United States on this theory, and, although she did not amend her complaint, she later expanded her thesis to include an allegation that the Park Service also failed to post adequate warning signs at or near the Northern Exit.[2]

The FTCA is a limited waiver of the federal government's sovereign immunity. Congress has prescribed a number of situations in which the waiver will not attach. See 28 U.S.C. § 2680. One relates to claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). Invoking this discretionary function exception, the government sought *brevis* disposition. The district court obliged. Shansky then prosecuted this appeal. We review de novo the lower court's determination that the discretionary function exception controls. See *Irving v. United States*, 162 F.3d 154, 161 (1st Cir.1998) (en banc).

A familiar analytic framework governs the discretionary function inquiry. An inquiring court first must identify the con-

---

* Hon. John R. Gibson, of the Eighth Circuit, sitting by designation.

1. The 1970 rehabilitation involved reconstruction of the wall in which the Northern Exit is located. The uncontroverted evidence shows that one of the Park Service's primary objectives during this reconstruction was to rebuild the wall with as much historical accuracy as possible. To this end, the Park Service engaged Navajo tribesmen to perform the repairs. The workers took the wall apart stone by stone, marking each stone's place and later restoring the stones in the same general location. Floors, doors, and windows were reconstructed with similar attention to historical detail.

2. Evidence in the record shows that employees of a nonprofit organization that manages the Trading Post's commercial activities did affix a hand-lettered warning sign near the Northern Exit some time after the rehabilitation. Shansky does not ask us to consider the import of this fact, focusing her attack instead on the Park Service's initial reconstruction planning.

duct that allegedly caused the harm. *See id.* at 161–62. Here, Shansky spotlights the Park Service's decisionmaking during the Trading Post's rehabilitation in 1970 as the culpable conduct, claiming that the Park Service abjured obvious safety measures. The issue, then, is whether this conduct is of the nature and quality that Congress, in crafting the discretionary function exception, sought to shelter from tort liability. That issue encompasses two questions: Is the conduct itself discretionary? If so, is the discretion susceptible to policy-related judgments? *See United States v. Gaubert,* 499 U.S. 315, 322–23, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991); *Berkovitz v. United States,* 486 U.S. 531, 536–37, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988); *Irving,* 162 F.3d at 161–62.

### *Is the Conduct Discretionary?*

■ Shansky endeavors to end the inquiry at the initial stage by showing that the Park Service had no discretion because existing policy mandated that it install handrails and warning signs when it refurbished the premises. She finds succor in a broadly worded expression of a general policy goal contained in the Park Service's operating manual to the effect that "[t]he saving of human life will take precedence over all other management actions." National Park Service, *NPS-28: Cultural Resource Management Guidelines* (Guidelines) 46 (July, 1994).[3] But this passage does not specifically prescribe that any particular safety measure be employed at any particular place or in any particular facility. To the contrary, it suggests that the Park Service and its functionaries will have to make discretionary judgments about how to apply concretely the aspirational goal embedded in the statement. *Accord Tippett v. United States,* 108 F.3d 1194, 1197 (10th Cir.1997). Statements made at this level of generality do not satisfy *Gaubert*'s and *Berkovitz*'s specific prescription requirement. Were the law otherwise, the discretionary function exception would be a dead letter.

The surrounding context in which the cited statement appears buttresses this conclusion.

Shansky plucks the statement from the Guidelines' description of park stewardship—but the paragraph in which the words appear goes on to note that, even though the saving of human life is a priority, Park Service policy "recognize[s] that public use of park resources sometimes involves elements of risk" and also "recognize[s] the need for management actions to limit risk to acceptable levels, consistent with acceptable levels of impact on cultural resources." Guidelines at 46. Consequently, the Guidelines, read as a whole, reinforce the view that Park Service management has discretion to determine which risks are "acceptable," and thus to balance, at some level, concerns for human safety against concerns for preserving the original qualities of a cultural resource.

Shansky next argues, in a related vein, that the Park Service, at the expense of historic authenticity, took other steps to make the Trading Post safe (for example, it replaced uneven floorboards during the reconstruction); and that, having opted for safety in these respects, the Park Service was somehow obliged to do more with the Northern Exit. This argument lacks force. Shansky's reference to other safety devices proves nothing, because the Guidelines, which did not specifically require the Park Service to install handrails or warning signs at the Northern Exit (or at any other comparable place, for that matter), gave the Park Service discretion to make precisely the kind of judgments that Shansky now assails (balancing competing considerations and opting for safety over authenticity in some applications, but not in others).

■ The only other evidence of a mandatory policy that Shansky proffers is a Park Service official's response to a question posed at his deposition. The questioner asked the deponent whether he "would agree that the National Park Service policies and regulations required [the Park Service] to identify dangers to the public," and the deponent responded affirmatively. From this slender reed, Shansky tries to build an argument that the Park Service adopted a binding poli-

---

3. Both parties refer us to the 1994 edition of the Guidelines. Therefore, we feel free to emulate the parties' implicit assumption that the policies

governing the Park Service's conduct at the time of the Trading Post's refurbishment were not materially different from those in effect in 1994.

cy to install handrails and warning signs at the Northern Exit. Setting to one side the rampant ambiguities inherent in the question and answer, the argument fails because Shansky has shown merely a Park Service official's unsubstantiated recollection of an unidentified policy statement. Although a government official's testimony about the substance of a putative policy sometimes may assist a court's understanding of agency practice, *see, e.g., Kelly v. United States,* 924 F.2d 355, 360–61 (1st Cir.1991) (explaining that an agency official's testimony may be used to aid a court in deciphering ambiguous regulations and guidelines), testimony that purports to describe written policies and regulations is no substitute for the original text. *See Valdez v. United States,* 56 F.3d 1177, 1179–80 (9th Cir.1995); *cf. Irving,* 162 F.3d at 166 (explaining that if a witness' statements are offered to show an agency's policy, the witness must, at a minimum, reconcile his understanding with the agency's more formal expressions of policy).

For these reasons, we find that the challenged conduct is discretionary.

### *Is the Discretion Policy–Driven?*

■ We turn next to the second half of the *Gaubert* test. On this score, Shansky asseverates that the Park Service's actions, even if discretionary, were not policy-driven. Because the law presumes that the exercise of official discretion implicates policy judgments, Shansky cannot prevail on this argument unless she demonstrates that the decision to forgo handrails and warning signs was not susceptible to policy analysis. *See Gaubert,* 499 U.S. at 325, 111 S.Ct. 1267; *Irving,* 162 F.3d at 167.

Shansky's effort to make the requisite showing emphasizes the actual decisionmaking that went into the 1970 retrofitting of the Trading Post. She insists that nobody in the Park Service perceived that the Northern Exit posed a danger and, thus, no one thought about installing handrails or warning signs. Shansky renewed this emphasis at oral argument, repeatedly asserting that the discretionary function defense should topple

solely because Park Service officials "failed to consider" the safety issues of which she complains.

■ Although Shansky marshals some evidence to support her claim—the Park Service apparently did not explicitly consider the safety *vel non* of the Northern Exit in 1970— her fact-based exegesis is beside the point. The subjective intent of government officials is irrelevant to the discretionary function analysis. *See Gaubert,* 499 U.S. at 325, 111 S.Ct. 1267; *Irving,* 162 F.3d at 166. It is therefore of no practical consequence that Park Service officials failed to mull particular safety issues when they planned the Trading Post's rehabilitation. *See Gotha v. United States,* 115 F.3d 176, 180 (3d Cir.1997) ("The test is not whether the government actually considered each possible alternative in the universe of options, but whether the conduct was of the type associated with the exercise of official discretion.") (citations and internal quotation marks omitted); *Kiehn v. United States,* 984 F.2d 1100, 1105 (10th Cir.1993) (holding that "it is unnecessary for government employees to make an actual 'conscious decision' regarding policy factors" for it is "irrelevant whether the alleged failure ... was a matter of 'deliberate choice,' or a mere oversight") (citations omitted); *Richardson v. United States,* 943 F.2d 1107, 1111 (9th Cir.1991) (holding that the "discretionary function exception may apply 'in the absence of a conscious decision' ") (citation omitted). In fine, an inquiring court need not ask whether government actors decided the point explicitly or actually discussed it, for the inquiry hinges instead on whether some plausible policy justification could have undergirded the challenged conduct. The critical question is whether the acts or omissions that form the basis of the suit are susceptible to a policy-driven analysis, not whether they were the end product of a policy-driven analysis.[4] *See Rosebush v. United States,* 119 F.3d 438, 444 (6th Cir.1997).

■ Let us be perfectly clear. We do not suggest that any conceivable policy justification will suffice to prime the discretionary

---

4. To the extent that *Dube v. Pittsburgh Corning, Owens-Illinois, Inc.,* 870 F.2d 790, 796 (1st Cir. 1989), suggests the contrary, the suggestion does not survive *Gaubert.*

function pump. Virtually any government action can be traced back to a policy decision of some kind, but an attenuated tie is not enough to show that conduct is grounded in policy. *See Cope v. Scott,* 45 F.3d 445, 448–49 (D.C.Cir.1995). Withal, the determination as to where one draws the line between a justification that is too far removed, or too ethereal, or both, and one that is not, is case-specific, and not subject to resolution by the application of mathematically precise formulae. In particular, there is no principled basis for superimposing a generalized "safety exception" upon the discretionary function defense. A case-by-case approach is required.

Of course, case-by-case development has led to some disarray. *Compare George v. United States,* 735 F.Supp. 1524, 1533–34 (M.D.Ala.1990) (holding that a government agency's failure to warn about submerged alligators has no policy basis) *with Tippett,* 108 F.3d at 1197–99 (holding that a failure to warn or otherwise abate the dangers associated with a charging moose is grounded in policy); *compare also Cope,* 45 F.3d at 451–52 (concluding that the discretionary function defense did not vitiate an alleged failure to warn about hazardous road conditions) *with Rich v. United States,* 119 F.3d 447, 451–52 (6th Cir.1997) (concluding that the discretionary function defense trumped an alleged failure to warn about hazardous road conditions), *cert. denied,* —— U.S. ——, 118 S.Ct. 1364, 140 L.Ed.2d 513 (1998). These pererrations cause us to despair of reconciling all the cases. Be that as it may, the decisional law yields several unifying principles that inform our analysis and shed sufficient light to remove this case from the gray area that suffuses this corner of the law.

■ Here, the government's ultimate policy justification is that forgoing handrails and warning signs at the Northern Exit was the product of a broader judgment call that favored aesthetics over safety. Aesthetic considerations, including decisions to preserve the historical accuracy of national landmarks, constitute legitimate policy concerns. *See Chantal v. United States,* 104 F.3d 207, 212–13 (8th Cir.1997); *Kiehn,* 984 F.2d at 1104–05. Indeed, Shansky does not seriously con-

test the legitimacy of aesthetic considerations as an abstract matter. Instead, her main theme—with a few variations, as we shall see—is that when safety becomes an issue, all else must yield. We cannot embrace so sweeping a proposition. *See Irving,* 162 F.3d at 168 n. 13 (warning courts to hesitate before imposing a principle of zero tolerance for any kind of risk, absent an express congressional or administrative command).

Congress instructed the Park Service to endeavor "to conserve the scenery and the natural and historic objects" of the property in its charge "and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 16 U.S.C. § 1. At the very least, this means that the Park Service may balance aesthetic concerns with those of visitor safety in reaching planning decisions, and that safety concerns will not automatically eclipse all other policy considerations. *See Chantal,* 104 F.3d at 212; *Kiehn,* 984 F.2d at 1104. There is nothing anomalous about this sort of balancing. We live in a world of incommensurable, often conflicting values. Some might prefer to sacrifice history to prevent even infinitesimal risks, whereas others might accept some hazards in order to preserve historical artifacts in a pristine state. It would be a much more convenient world if we had a single metric with which to measure, and thereby prioritize, all values—but as long as that luxury eludes us, we must rely upon policymakers to reconcile the ensuing conflicts.

In this instance, the statutory scheme empowers the Park Service to balance incommensurable values such as safety and aesthetics, and the Judicial Branch is ill-equipped to rework that balance. *See United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 814, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984); *Chantal,* 104 F.3d at 212. We think it follows that inquiries into whether a discretionary act is policy-driven cannot be short-circuited simply by raising the specter of a general safety exception.

In a more refined version of the same argument, Shansky points to the Park Service's installation of sprinklers, an alarm sys-

tem, fire extinguishers, and the like in the reconstructed Trading Post and posits that, once the Park Service decided to effectuate some modern safety measures, it became obliged to take all feasible safety measures. To support this thesis, Shansky relies primarily on the discussion of a "failure to warn" claim in *Cope v. Scott*, 45 F.3d 445 (D.C.Cir.1995). We believe that Shansky loads more on *Cope* than *Cope* can bear.

*Cope* involved, *inter alia*, claims asserting negligence in the construction, maintenance, and installation of warnings relating to Beach Drive, a road administered by the Park Service. Cope, an accident victim, claimed, among other things, that the Park Service's failure to install proper warnings at important points along the road caused his misfortune. Despite the Park Service's protests, the record showed that it had treated Beach Drive as a commuter road, not a scenic drive; that it had installed numerous traffic devices and signs at frequent intervals along the road (including two "slippery when wet" signs in the immediate area in which the accident occurred); and that it had erected the signs in accordance with the manual on Uniform Traffic Control Devices (the Manual). *See id.* at 446–47, 451–52. These facts justified a finding that, with respect to traffic warning devices on Beach Drive, the Park Service already had made a specific policy decision to favor safety over aesthetics. *See id.* at 452 (concluding that the Park Service had "chosen to manage the road in a manner more amenable to commuting through nature than communing with it"). Within the context of that priority-setting policy decision, the only discretion that the Park Service exercised in posting signs and devices was

the discretion provided for in the Manual. *See id.* at 451. Although that discretion involved safety assessments regarding, for example, what types of traffic safety devices were needed and where they should be placed, it did not involve the exercise of policy-based discretion. *See id.* at 451–52.

This holding falls neatly into a line of cases involving plaintiffs who challenge official judgments that implicate technical safety assessments conducted pursuant to prior policy choices. *See, e.g., Ayala v. United States,* 980 F.2d 1342, 1348–49 (10th Cir.1992); *Andrulonis v. United States,* 952 F.2d 652, 655 (2d Cir.1991). Such decisions come within a category of objective professional judgments that, without more, are not readily amenable to policy analysis. *See Berkovitz,* 486 U.S. at 545, 108 S.Ct. 1954 (indicating that discretion involving application of "objective scientific standards" is not policy-based discretion); *Kennewick Irrigation Dist. v. United States,* 880 F.2d 1018, 1030 (9th Cir.1989) (similar). Thus, to determine whether an action taken in such circumstances is grounded in policy-based discretion, the operative distinction is the one between a judgment that embodies a professional assessment undertaken pursuant to a policy of settled priorities and a fully discretionary judgment that balances incommensurable values in order to establish those priorities.[5]

Against this backdrop, *Cope* is readily distinguishable. In this case, unlike in *Cope,* no directive bound the designers of the Trading Post rehabilitation to a pre-determined safety policy that contained established priorities. Moreover, unlike *Cope,* this case does not involve technical safety assessments. Rather, Shansky challenges the initial planning

---

5. This distinction clearly underpins the analysis in cases such as *Summers v. United States,* 905 F.2d 1212 (9th Cir.1990), and *ARA Leisure Serv. v. United States,* 831 F.2d 193 (9th Cir.1987). The distinction is perhaps illustrated most effectively by contrasting *ARA Leisure*'s separate holdings. The court concluded that the Park Service's initial decision to design and construct a park road without guardrails was protected by the discretionary function exception (principally on the ground that Park Service policies required roads to be "esthetically pleasing"), yet held that failure to maintain a certain stretch of the road in a safe condition was not grounded in policy (and, therefore, not protected). *See id.* at

195. In a particularly revealing passage, the court explained that "where the challenged governmental activity involves safety considerations under an established policy rather than the balancing of competing policy considerations, the rationale for the exception falls away and the United States will be responsible for the negligence of its employees." *Id.* (quoting *Aslakson v. United States,* 790 F.2d 688, 693 (8th Cir.1986)). The District of Columbia Circuit drew essentially the same distinction in upholding Cope's "failure to warn" claim, but foreclosing his "failure to make the road surface skid-resistant" claim. *See Cope,* 45 F.3d at 450–51.

decisions made during the refurbishment of the Trading Post in 1970—and unlike in *Cope*, those decisions, whether or not actually made with policy considerations in mind, were susceptible to policy analysis. Indeed, they required the unrestrained balancing of incommensurable values—including safety, aesthetics, and allocation of resources—typically associated with policy judgments.[6]

 The short of it is that a commitment to safety in one area does not oblige an agency to strike the balance in favor of safety in every other area. Here, for example, the Park Service legitimately could conclude that whereas sprinklers and alarm systems were highly desirable regardless of aesthetic impact (given the dire consequences that might attend their absence and their relative inconspicuousness), the aesthetic cost of handrails and warning signs outweighed the predictable safety benefits. Thus, the installation of fire safety devices does not necessarily compel the endorsement of handrails or warning signs. We agree with the Tenth Circuit that "[a] decision that is a component of an overall policy decision protected by the discretionary function exception also is protected by this exception." *Johnson v. United States*, 949 F.2d 332, 338 (10th Cir.1991) (quoting *Zumwalt v. United States*, 928 F.2d 951, 955 (10th Cir.1991)). As long as the eschewal of handrails and warning signs was a component of the initial overall policy decision—and everything in this case suggests that it was—the discretionary function exception protects the Park Service's conduct.

The situation might be different, of course, had the Park Service committed itself to installing handrails and warning signs throughout the Trading Post, and then neglected the Northern Exit. In such a setting, one might argue that the Park Service's discretion was cabined by a prior policy judgment. *See, e.g., Cope*, 45 F.3d at 452. But Shansky makes no such argument. She contends only that the existence of some safety devices necessitates the installation of all kinds of safety precautions—and that contention clearly goes too far.

 For similar reasons, we reject Shansky's argument that the Park Service's installation of a handrail at the Northern Exit subsequent to her mishap proves that the decision to forgo one in 1970 was not policy-based. For purposes of discretionary function analysis, there is no distinction between an initial balancing of policy factors and a subsequent balancing of such factors, yielding a new discretionary judgment, as long as the latter can be considered to be of the same nature as, or a component of, the former. Given the facts of this case, the only thing that the later action evinces is that the Park Service made a subsequent policy decision to elevate safety over aesthetics. An agency that has discretion to make policy choices can change its view as to the proper balance of relevant concerns as time passes and experience accrues.

Finally, Shansky suggests that the Park Service's conduct does not fall within the discretionary function exception because there is no link between the aesthetic concerns supporting a decision not to install a handrail and the safety considerations that militate the other way. It is true that, in a rare case, the government's invocation of a policy justification may be so far-fetched as to defy any plausible nexus between the challenged conduct and the asserted justification. *See, e.g., Duke v. Department of Agric.*, 131 F.3d 1407, 1412 (10th Cir.1997) (concluding that the government failed to explain or demonstrate how neglecting to warn campers about the dangers of rolling boulders at a popular campsite—whether by warning signs or in tourist literature—could have been a policy decision). Withal, such cases invariably involve extreme circumstances, and the Trading Post renovations fall comfortably outside this niche. The evidence is undisputed that the Park Service desired to maintain a quantum of historical accuracy at this much-frequented site; that the Trading Post historically had no handrails or warning

---

**6.** We do not suggest resurrection of the moribund planning/operation distinction that the Supreme Court previously laid to rest. *See Gaubert*, 499 U.S. at 325–26, 111 S.Ct. 1267. Instead, our focus rests primarily on the nature of the Park Service's decisions—as opposed to who was making them—and on the factors that the decisionmakers legitimately could consider when making judgments about which safety devices, if any, should be installed.

signs at the Northern Exit; and that no prior injuries had been reported. Although the condition of the Northern Exit may have been dangerous to a degree, it was not fraught with the same potential peril as, for example, the camp ground in *Duke,* where a boulder smashed into a camper's tent, causing severe brain damage to a six-year old boy. In *Duke,* recognizing a nexus between the government's inaction and its asserted policy justifications was deemed untenable. *See id.* Under the far different circumstances of this case, however, recognizing a nexus between the Park Service's conduct and its asserted policy justification is not unreasonable.

We need go no further. We are fully persuaded that the 1970 decision not to place handrails or warning signs at the Northern Exit is—and was—susceptible to policy analysis. No more is exigible to satisfy the objective inquiry that *Gaubert* demands. Consequently, we are in complete accord with the Eighth Circuit, which, responding to an analogous claim under hauntingly similar circumstances, concluded that the discretionary function defense protected the Park Service's decision to construct a stairwell in the Gateway Arch in St. Louis, Missouri, without a handrail or warning sign. *See Chantal,* 104 F.3d at 210–13.

*Affirmed.*