**Weingarten v. USA**                    **CV-97-494-B    02/10/99**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


**Leonard B. Weingarten,**
**Individually and as Administrator of**
**the Estate of Cheryl Barrie Weingarten,**
        **Plaintiff**

        v.                                    Civil No. 97-393-B

**United States of America,**
        **Defendant**


**O R D E R**

Plaintiff Leonard Weingarten ("Plaintiff") brings this action under the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680 (West Supp. 1998), claiming that the United States ("Defendant") caused the death of his daughter.  Defendant has moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) or, in the alternative, for summary judgment pursuant to Fed. R. Civ. P. 56, for lack of subject matter jurisdiction.  For the reasons set forth below, I find that this court does not have subject matter jurisdiction over Plaintiff's claims and, accordingly, I grant Defendant's motion to dismiss.

## FACTS

Cheryl Barrie Weingarten ("Cheryl") died after falling into a crevasse on Tuckerman Ravine ("the Ravine"), a popular skiing and hiking spot on Mount Washington.[1] Mount Washington is the highest peak in the northeastern United States, located in the White Mountain National Forest ("the Forest") in the State of New Hampshire. The United States Forest Service and its Snow Rangers manage the Ravine as part of the Forest's Pinkham Notch Scenic Area. The Forest Service manages the Ravine in accordance with the Forest Service Manual, which was issued pursuant to federal regulations. See, e.g. 7 C.F.R. § 2.7 (1998). The Manual incorporates by reference the Forest Service Handbooks, which set forth guidance and instructions for carrying out the Service's various policies with respect to the Forest.

The Ravine is a large, semicircular, natural basin set within the mountain. The Ravine walls reach an altitude of 5,100

---

[1] The Ravine attracts between 2,000 and 4,000 visitors on nice spring weekend days, as the deep snow pack allows skiing well into May. See Def.'s Ex. A, Declaration of Bradley Ray at ¶¶4, 5. The Forest Service estimated that 3,900 people used the Ravine on April 30, 1994, the day before Cheryl's death. See id. at ¶5.

feet, with steep slopes ranging from 35 to 55 degrees.  The area is undeveloped and has no ski lift facilities.  Thus, skiers must hike approximately three hours from Pinkham Notch to the top of the Ravine, carrying their equipment, and ski back down.  Some skiers elect to hike only part-way up, remaining in the Bowl area of the Ravine below the steep Headwall.

In the early spring, the main dangers associated with hiking and skiing the Ravine are undermined snow and open crevasses.[2] The crevasse into which Cheryl fell is known as the Cutler River waterfall crevasse, which opens up every spring.  The river runs all year long, despite sometimes being covered by up to 80 feet of snow.  The river runs through the Ravine and over the Headwall.  The crevasse forms under the waterfall and, like other crevasses which open up in the Ravine, can reach depths of over 75 feet.

Cheryl was 21 years old at the time of her death.  She was scheduled to graduate from Tufts University two weeks later. Cheryl and three friends -- Anna Shapiro, Julie Parsons, and Nicholas Nardi -- drove from school to the mountain on May 1,

---

[2]  Undermined snow has melted snow or water underneath it, which can cause the snow to collapse beneath a person.

1994.[3] Shapiro planned to ski while Cheryl and the others hiked. Shapiro had skied the Ravine on previous occasions, while Nardi had hiked it once. Cheryl had neither skied nor hiked the Ravine prior to May 1, 1994.

Cheryl and her friends drove to the Pinkham Notch Visitors Center, where they changed clothes. While there, they may have checked the weather conditions posted inside. The weather called for rain tapering into scattered showers, with temperatures in the 40s and obscured summits. The Visitors Center provides informational notices and brochures, at least two of which explicitly warn of the dangers of open crevasses during the spring months.

The Forest Service also posts an Avalanche Bulletin at the Visitors Center, but neither Nardi nor Shapiro recalled seeing one there. Nor did they recall seeing the bulletin posted at the Appalachian Mountain Club caretakers hut at the Hermit Lake Shelters, about 2.4 miles from the Visitors Center.[4] The

_____

[3] Tufts University is located just outside of Boston, Massachusetts, approximately 150 miles from Tuckerman Ravine.

[4] The evidence is unclear as to which Avalanche Bulletin was posted at the time of Cheryl's visit. A bulletin dated April 28, 1994, did not warn of open crevasses. A subsequent bulletin, dated 2:30 p.m. on May 1, 1994, did note that crevasses may open up, but does not specifically note the Cutler River waterfall crevasse or its location. Viewing the evidence in the light most

-4-

Avalanche Bulletin warns of open crevasses once the Forest Service becomes aware of their existence.  The group continued on and then split up at Lunch Rocks, a group of boulders below the Headwall, between 1 and 2 p.m., with Shapiro skiing and Cheryl and the others continuing to hike.  While still in the Ravine, the weather conditions worsened.  Despite clouds and fog, making it impossible to see more than 100 feet ahead, the trio continued to the summit of Mt. Washington.

While descending, Cheryl and Parsons began sliding down the Ravine on their rear-ends.  Nardi continued on foot because he knew there was a steep drop-off and, since he couldn't see where he was going, he "didn't want to go there fast."  Def.'s Ex. D, Dep. of Nicholas Nardi at 60.  He lost sight of the two women, and then heard Parsons screaming.  Nardi was able to locate Parsons, who was on the edge of a steep drop-off.  He helped Parsons climb to safety, but they were unable to locate Cheryl. They hiked back to Hermit Lake, where they reported Cheryl

favorable to Plaintiff, I will assume without deciding that, had Cheryl read the Bulletin, it would have been the April 28 version with no mention of the crevasse danger.

missing.

The Snow Rangers began a search-and-rescue mission, and located slide marks going over the Headwall above the Cutler River waterfall crevasse. Because of the heavy water flow and rain, the Rangers decided it was too dangerous to descend into the crevasse that night. Cheryl's body was recovered the following morning.

The Forest Service did not erect any barriers or otherwise mark the crevasse's location in the Ravine. The Forest Service previously considered options, such as erecting a fence or placing cross-poles above the Headwall over the crevasse, but ultimately rejected them. Lead Snow Ranger Bradley Ray stated that such ideas were rejected based on the Forest Service's policy of maintaining the Ravine in its natural state, as well as safety and feasibility concerns involved with erecting and maintaining such barriers. See Def.'s Ex. A, Declaration of Bradley Ray at ¶¶ 27-36.

Plaintiff is pursuing three claims against Defendant pursuant to the Federal Tort Claims Act ("the Act"). First, Plaintiff argues that Defendant negligently caused Cheryl's death by failing to warn her of the crevasse. Second, Plaintiff alleges that Defendant intentionally caused Cheryl's death by

"willfully and/or maliciously" failing to guard against or warn her of the crevasse. Finally, Plaintiff brings a claim for the loss of society, services, and comfort of his daughter.

Defendant argues that I have no jurisdiction to hear Plaintiff's claims. First, Defendant argues that Plaintiff's claims are barred by the Act's "discretionary function exception." Second, Defendant argues that Plaintiff's claims do not fall within the Act's grant of subject matter jurisdiction because New Hampshire's recreational use statutes would bar liability had Cheryl died under similar circumstances on privately-owned property. Finally, Defendant argues that New Hampshire law does not recognize Plaintiff's claim for the loss of society, services, and comfort of his daughter. Because I find that this court lacks subject matter jurisdiction over Plaintiff's claims by virtue of the Act's discretionary function exception, I do not need to address Defendant's remaining arguments. See Magee v. United States of America, 121 F.3d 1, 3 (1st Cir. 1997)(district court must first determine whether exception precludes claim and then, if not, whether a private actor would be liable under the circumstances).

## STANDARD

The party seeking to invoke the court's jurisdiction bears the burden of establishing that jurisdiction exists. See Aversa v. U.S., 99 F.3d 1200, 1209 (1st Cir. 1996). I must construe Plaintiff's complaint liberally and treat all well-pleaded facts as true, viewing them in the light most favorable to the Plaintiff. See Murphy v. U.S., 45 F.3d 520, 522 (1st Cir. 1995)(noting similar standard applies to motions to dismiss under both Fed. R. Civ. P. 12(b)(1) and 12(b)(6)). A Plaintiff's unsupported conclusions or interpretations of law, however, are insufficient to defeat a motion to dismiss. See id. I may consider matters outside the pleadings without converting a 12(b)(1) motion to dismiss into a motion for summary judgment. See Aversa, 99 F.3d at 1210. I apply these standards to the issues raised by the parties in this action.

## DISCUSSION

The United States government cannot be sued without its consent. See Murphy, 45 F.3d at 522 (citing United States v. Dalm, 494 U.S. 596, 608 (1990)). The Federal Tort Claims Act, however, acts as a broad waiver of the government's sovereign immunity, granting federal courts jurisdiction to hear certain

claims against the United States.  See Attallah v. U.S., 955 F.2d

776, 782 (1st Cir. 1992).  Under the Act, I have jurisdiction to

hear claims brought against the United States for damages

> caused by the negligent or wrongful act or omission of
> any employee of the Government while acting within the
> scope of his office or employment, under circumstances
> where the United States, if a private person, would be
> liable to the claimant in accordance with the law of
> the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).  The government's waiver of immunity is

limited, however, by the Act's exceptions.  See 28 U.S.C. §

2680(a)-(n).  Relevant here is the Act's so-called "discretionary

function exception," which operates to deprive this court of

jurisdiction over claims arising out of "the exercise or

performance or the failure to exercise or perform a discretionary

function or duty on the part of a federal agency or an employee

of the Government, whether or not the discretion involved be

abused."  28 U.S.C. § 2680(a).  Thus, if the discretionary

function exception precludes Plaintiff's claims I must grant

Defendant's motion to dismiss for lack of subject matter

jurisdiction.  See Magee, 121 F.3d at 3; Attallah, 955 F.2d at

782.

The discretionary function exception encompasses a two-step

inquiry.  See United States v. Gaubert, 499 U.S. 315, 322-23

(1991); Shansky v. United States of America, ___ F.3d ___, 1999

WL 2476 at *1 (1st Cir. 1999); Magee, 121 F.3d at 4. First, I must determine whether the government's conduct was, by its nature, discretionary. See Shansky, ___ F.3d ___, 1999 WL 2476 at *1 (citing Gaubert, 499 U.S. at 322-23). If so, I must consider whether the government's discretionary action was susceptible to policy-related judgments. See id. Here, the relevant conduct is the Defendant's alleged failure to warn of or guard against the dangers of the Cutler River waterfall crevasse at Tuckerman Ravine.

1.   Was the government's conduct discretionary?

Discretionary actions involve judgment and choice. See Gaubert, 499 U.S. at 325; Magee, 121 F.3d at 4. An action involves judgment and choice and is, therefore, discretionary, where the actor is not bound to follow a particular procedure. See Gaubert, 499 U.S. at 325 (daily management of banking affairs); Shansky, ___ F.3d ___, 1999 WL 2476 at *2 (Park Service not bound to follow particular safety measures in redesign of historic trading post); Magee, 121 F.3d at 4 (VA drivers licensing program did not require psychologists to follow particular course of conduct). An action does not involve judgment or choice, however, where a statute, regulation, or

policy "specifically prescribes a course of action . . . to follow, because [there is] no rightful option but to adhere to the directive." Gaubert, 499 U.S. at 322 (quoting Berkovitz v. United States, 486 U.S. 531, 536 (1988)).

Here, Plaintiff's argument is two-fold. First, Plaintiff argues that the discretionary function exception is inapplicable because no governmental directive or regulation specifically bans or requires posted warning signs in the Forest. Second, Plaintiff argues that Defendant violated Forest Service safety regulations by failing to warn of or guard against the crevasse.

As to the first point, it is clear that Plaintiff misapprehends the discretionary function analysis. Contrary to Plaintiff's assertion, the absence of a regulation mandating specific conduct on the part of the Forest Service is not fatal to Defendant's discretionary function argument. See Gaubert, 499 U.S. at 325. Rather, that fact serves only to bolster Defendant's argument that the discretionary function exception bars Plaintiff's claims. See Shansky, ___ F.3d ___, 1999 WL 2476 at *2; Magee, 121 F.3d at 4. In the absence of a regulation mandating specific conduct, the Forest Service must exercise choice or judgment and, thus, discretion, in carrying out its duties. See id. Plaintiff himself quotes Lead Snow Ranger

Bradley Ray, who stated:

> [N]othing in the statutes, regulations or Forest Service policies dictate particular actions that I must follow in the handling of hazards, warning the public of those hazards, or managing public safety issues in the Ravine. . . . Nothing in the Trail Management Handbook mandates specific actions that I, or any other Forest Service official, was required to take in the handling of a safety hazard such as the waterfall crevasse.

See Def.'s Ex. A, Declaration of Bradley Ray at ¶¶10, 13. Snow Ranger Ray's statements support, rather than undermine, a finding that the Defendant's actions were, in fact, discretionary. See Shansky, ___ F.3d ___, 1999 WL 2476 at *2.

Plaintiff fares no better by pointing to the Forest Service regulations. Plaintiff primarily relies on Forest Service Manual Chapter 2330 to support his argument that the Defendant violated its own public safety regulations. Chapter 2330, however, does not apply to the management of Tuckerman Ravine.[5] The

---

[5] Forest Service Manual Chapter 2330 applies to "developed recreation areas," while Chapter 2350 applies to "dispersed recreation areas" as those terms are defined in the White Mountain National Forest Plan. See Def.'s Ex. K, Declaration of George R. Pozzuto at ¶¶ 6-10; Def.'s Ex. A., Declaration of Bradley Ray at ¶12. Tuckerman Ravine is a "dispersed recreation area." See Def.'s Ex. K at ¶¶ 7,9-10. Even assuming that Chapter 2330 does apply to the management of Tuckerman Ravine, Plaintiff cannot demonstrate that Chapter 2330 mandates specific procedures or conduct. Like Chapter 2350 and the incorporated Handbooks, Chapter 2330 clearly allows for judgment, choice, and discretion on the part of Forest Service employees. See, e.g. Kelly v. United States of America, 924 F.2d 355, 360 (1st Cir.

regulations which do apply to the management of Tuckerman Ravine further support a finding that Defendant's actions were discretionary in nature. See Forest Service Manual Chapter 2350; Forest Service Trail Management Handbook; Forest Service Sign Handbook; Standards for Forest Service Signs and Posters. The Manual and incorporated handbooks do not mandate particular procedures or courses of action. Rather, they set forth general guidelines to follow in carrying out the agency's goals. For example, Plaintiff cites the Standards for Forest Service Signs and Posters, which is incorporated into the Forest Service Manual, and which directs the Forest Service to:

> Provide appropriate user information/education services at trailheads through well designed and located bulletin board displays. Limit posters and other materials to only those essential for user safety and pertinent to the trail or area. Bulletin board information needs vary according to trail use. The following list is not all-inclusive, but includes some information items applicable to all trails. Some are appropriate only to specific types of trails. Consider: (1) Safety information such as: Current trail conditions. Nearest telephone. Hazards. Survival tips. . . .

Standards for Forest Service Signs and Posters at 5.4.6d, On-Site User Information. The language of 5.4.6d clearly contemplates that Forest Service employees use choice, judgment, and

_____

1991).

-13-

discretion. Other portions of the Manual similarly contemplate the use of discretion. The Manual is a "mixed bag, interweaving imperatives with weaker, precatory verbs and generalities more characteristic of discretion than of mandatory directives." Kelly v. United States of America, 924 F.2d 355, 360 (1st Cir. 1991)(finding DEA department manual gave employees discretion despite "mandatory" words like "will" and "must"). Thus, I find that the Forest Service's decision not to barricade the crevasse or post more explicit warnings about the crevasse was a discretionary action for purposes of §2680(a).[6]

---

[6] Plaintiff also argues that the Defendant's decision to warn of or guard against some dangerous conditions in the Forest, but not the crevasse in question, removes that decision from the protection of §2680(a). Plaintiff claims that, by warning of some dangers but not others, Defendant induced Cheryl's reliance on the warnings to her detriment. This argument has no merit. First, to the extent that Plaintiff is arguing that the Forest Service was negligent in carrying out its duties, it is well settled that §2680(a) shields the government from liability for its discretionary acts even when those acts are carried out negligently. See Gaubert, 499 U.S. at 323 (citing United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 820 (1984)); Brown v. United States of America, 790 F.2d 199, 203 (1st Cir. 1986). Furthermore, where the government undertakes an action to protect public safety, the public has no right to expect a level of complete care. See Brown, 790 F.2d at 203-4. To hold otherwise would "make the discretionary exception self-destructive." Id. at 203.

2.   Was the government's conduct susceptible to policy-related
     judgments?

The discretionary function exception shields only those governmental actions which are based on considerations of public policy.  See Gaubert, 499 U.S. at 323; Magee, 121 F.3d at 5.  The law presumes that the exercise of official discretion implicates policy judgments.  See Shansky, ___ F.3d ___, 1999 WL 2476 at *3 (citing Gaubert, 499 U.S. at 324).  "[T]he very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulations involves consideration of the same policies which led to the promulgation of the regulations."  Gaubert, 499 U.S. at 324.  Thus, Plaintiff must demonstrate that the Defendant's decision not to warn or guard against the crevasse was not susceptible to policy analysis.  See id.  I must focus "not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis."  Gaubert, 499 U.S. at 325.

Plaintiff claims that Defendant chose not to post warnings or barricade the waterfall crevasse for purely "aesthetic reasons."  That rationale, Plaintiff argues, is not in furtherance of any Forest Service policy and, thus, is not "susceptible to policy analysis."  Plaintiff is incorrect.

-15-

Aesthetic considerations are legitimate policy concerns. See Shansky, ___ F.3d ___, 1999 WL 2476 T *4. Furthermore, aesthetic considerations -- such as preserving the Forest in its natural condition -- are clearly within the policy goals of the Forest Service. See, e.g. 16 U.S.C. §475 (Forest Service must "improve and protect the forest"); Forest Service Manual Chapter 2303.8 ("Strive for natural unmanicured atmospheres even when sophisticated facilities are necessitated by local conditions."); White Mountain National Forest Plan, Chapter III-2 ("Conduct all management activities with full recognition of the appearance of the forest, realizing the importance to society of a natural landscape distinct from the man-made environments otherwise dominate in the East.").

Plaintiff has produced no evidence that the Forest Service must put public safety before other policy concerns.[7] See Shansky, ___ F.3d ___, 1999 WL 2476 at *4-5 (rejecting blanket assertion that all other policy concerns must yield where safety is at issue). Rather, the Forest Service is free to engage in a balancing of competing policy interests. See id. at *5 (Park

_____

[7] Plaintiff cites to Forest Service Manual Chapter 2330 for the proposition that safety concerns are a top priority. As noted above, Chapter 2330 is inapplicable to the management of Tuckerman Ravine.

-16-

Service not obligated to put public safety concerns above policy of preserving history accuracy of landmark).

Indeed, Defendant has produced evidence that the Forest Service considered several factors other than preserving the Ravine's natural state, including public safety, when deciding how best to deal with the waterfall crevasse. Lead Snow Ranger Ray stated that the Forest Service rejected plans to erect cross-poles over the spot because the snow melt would require that the poles be replaced at least every other day, putting a strain on limited staffing resources and exposing employees to frequent dangers. Ray also noted that, in his experience, cross-poles have a limited benefit. Visitors often approach the poles, exposing themselves to the risks of undermined snow. See Def.'s Ex. A at ¶29. Thus, the Forest Service weighed the competing policy goals of public safety, employee safety, conserving staffing resources, and maintaining the site in its natural state. It is precisely this type of policy balancing that Congress intended to protect. See Shansky, ___ F.3d ___, 1999 WL 2476 at *5. That Plaintiff disagrees with the Forest Service's ultimate decision is of no import to the discretionary function analysis.

Plaintiff also takes issue with the Forest Service's actual attempts to warn the public about the crevasse danger. The Forest Service chose to warn the public through brochures, face-to-face contact, and the Avalanche Bulletin.[8] This discretionary decision involves balancing policy considerations. See Valdez v. United States, 56 F.3d 1177, 1180 (9th Cir. 1995)("Faced with limited resources and unlimited natural hazards, the [National Park Service] must make a public policy determination of which dangers are obvious and which dangers merit the special focus of a warning brochure or pamphlet."); see also Rosebush v. United States of America, 119 F.3d 438, 443 (6th Cir. 1997)(decision whether to warn of potential danger a protected discretionary function). Moreover, the Forest Service cannot possibly warn the public of every danger associated with skiing and hiking the Ravine. To do so would not only cut into limited financial resources, but could also have a limited public safety benefit. See Valdez, 56 F.3d at 1180 ("too many warning brochures and pamphlets would inevitably reduce the impact of the individual warnings on the public").

---

[8] To the extent Plaintiff argues that the Forest Service was negligent in carrying out these warnings, the discretionary function exception would still apply to bar Plaintiff's claim. See Gaubert, 499 U.S. at 323; 28 U.S.C. § 2680(a).

## CONCLUSION

Based on the foregoing analysis, I find that the Defendant's decision not to barricade or post warnings of the waterfall crevasse was a discretionary act susceptible to policy judgments and, therefore, was the type of discretionary governmental action Congress intended to protect. Accordingly, I find that this court lacks jurisdiction to hear Plaintiff's claims as they are based on acts or omissions of the government which fall within the discretionary function exception to the Federal Tort Claims Act. Thus, I grant Defendant's motion to dismiss (document no. 21) and dismiss Plaintiff's claims for lack of subject matter jurisdiction.

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

February 10, 1999

cc:  Gretchen Leah Witt, AUSA
     June Resnick German, Esq.
     Peter G. McGrath, Esq.