**Michael MAHON, Plaintiff,**

v.

**UNITED STATES of America; Eastern National; and Amelia Occasions, Inc. doing business as Historic Venues, doing business as The Commandant's House, Defendants.**

**Civil Action No. 10–11611–WGY.**

United States District Court,
D. Massachusetts.

June 8, 2012.

---

Alan Seewald, Seewald, Jankowski & Spencer, P.C., Amherst, MA, Alan S. Zwiebel, Jonathan Fairbanks, Zwiebel & Fairbanks LLP, Kingston, NY, for Plaintiff.

Barbara Healy Smith, United States Attorney's Office, Curtis L.S. Carpenter, William J. Flanagan, Morrison, Mahoney, & Miller LLP, Boston, MA, John J. Lang, Lang & Associates, Lynnfield, MA, for Defendants.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

## I. INTRODUCTION

This is an action under the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680. The plaintiff Michael Mahon ("Mahon") alleges that the failure of the United States[1] to

---

1. Two other parties, Eastern National and Amelia Occasions, Inc., have also been sued;

alter a railing on the second story portico of the Commandant's House on the Charlestown Navy Yard resulted in Mahon falling over that railing and sustaining severe injuries. Mahon further alleges that in its dealings with Eastern National and Amelia Occasions, Inc. ("Amelia Occasions"), the United States was required to employ a so-called "concession contract," which would have imposed on the United States a non-discretionary duty to establish a risk management plan. The lack of such a plan, Mahon asserts, allowed the railing's height to go unchecked.

The United States moves to dismiss Mahon's claim under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. The United States argues that Mahon's claim is barred by the discretionary function exception of the Federal Tort Claims Act, 28 U.S.C. § 2680(a). The United States asserts that both the choice of what type of contract to use and whether to alter the railing were within the discretion of the United States.

## A. Procedural Posture

On March 28, 2011, this Court dismissed a previous complaint by Mahon for lack of subject matter jurisdiction under the discretionary function exception of the Federal Tort Claims Act. Order Dismissal, ECF No. 18. Mahon later moved for reconsideration, alleging that the United States, through the Boston National Historic Park (the "Boston Park"), failed to establish a risk management plan that would have identified the problem related to the railing, and the failure to do so was not subject to Boston Park's discretion. Pl.'s Mot. Recons. Am. or Alter J. Pursuant

FRCP Rule 59(e) & Relief J. FRCP Rule 60(b)(1), 60(b)(2) & 60(b)(6), ECF No. 21. This Court granted the motion for reconsideration on April 12, 2011. Order, ECF No. 23.

After considering the parties' submissions, this Court vacated the March 28, 2011 Order of Dismissal and allowed the claim to move forward with discovery to determine whether the defendants' relationship was governed by a so-called "concession contract." [2] *Mahon v. United States*, 795 F.Supp.2d 149 (D.Mass.2011) (*"Mahon I"*). In *Mahon I*, however, this Court left open the final determination of whether the guardrail height was within the policy discretion of the relevant government agency. *Id.* at 157.

The United States now moves again to dismiss the instant complaint for lack of subject matter jurisdiction or in the alternative, for summary judgment, asserting that the discretionary function exception bars Mahon's claim. Renewed Mot. U.S. Dismiss Claims or Summ. J., ECF No. 47; Mem. Supp. Renewed Mot. U.S. Dismiss Claims or Summ. J. ("Def.'s Mem.") 6–7, ECF No. 48.

## B. Facts as Alleged

Mahon was lawfully walking around the second story portico of the Commandant's House when he fell over the portico's railing and sustained "severe and permanent injuries." Am. Compl. ¶ 43, ECF No. 12. Mahon asserts that the injuries were a result of "the dangerous and defective condition of the railing." *Id.* Mahon claims damages of twenty million dollars. *Id.* ¶ 47.

the instant order only pertains to the United States.

**2.** In this context, a concession contract is a binding written agreement between the Na-

tional Park Service and a concessioner that authorizes the concessioner to provide certain visitor services within a park area under specified terms and conditions. 36 C.F.R. § 51.3.

The United States, through the National Park Service (the "Park Service"), owns, operates, and controls the Commandant's House, which is a part of the Charlestown Navy Yard in Boston, Massachusetts. *Id.* ¶¶ 17–33. The Commandant's House and the Charlestown Navy Yard are a part of the Boston Park. *Id.* ¶ 17.

On March 22, 2005, the Boston Park entered into an agreement with Eastern National, a non-profit company, in order to provide "service to visitors and income to Boston." Def.'s Mem., Ex. 31, Mem. Agreement E. Nat'l & Bos. Nat'l Historic Park ("Eastern National Agreement") 1, ECF No. 65. Eastern National, in turn, entered into an agreement with Amelia Occasions, a for-profit company, in order for Amelia Occasions to provide the services requested by the Boston Park. Def.'s Mem., Ex. 32, Agreement E. Nat'l & Amelia Occasions, Inc. ("Amelia Agreement") 1, ECF No. 65.[3]

The then Chief of Interpretation, William Foley ("Foley"), was concerned that the agreement with Amelia Occasions should have been a "concession contract." Def.'s Mem. 6; Mem. Opp'n Def.'s Mot. Dismiss or Summ. J. ("Pl.'s Mem.") 5, ECF No. 68. Several months before Mahon's accident, Foley apparently brought up his concerns with other park officials, but these officials disagreed with the need for a "concession contract." Def.'s Mem. 6; Pl.'s Mem. 5. The purpose of creating the agreement with Amelia Occasions appears to be for profit rather than purely for the education of visitors. Def.'s Mem., Ex. 10, Email Correspondence between Chelsea Moroz and Terry Savage (Apr. 30, 2004), ECF No. 60.

The agreements between the Boston Park and Eastern National, as well as between Eastern National and Amelia Occasions, set out the divisions of gross income and the responsibilities of Eastern National and Amelia Occasions. Eastern National Agreement 1–3; Amelia Agreement 1–3. The Eastern National Agreement provides that Eastern National or its Operator (Amelia Occasions) "will be responsible for ensuring all catered events at the Facility comply with all applicable local, state, and federal laws, ordinances, health codes and standards." Eastern National Agreement 2. A similar provision exists in the Amelia Agreement, placing the responsibility on Amelia Occasions. Amelia Agreement 2.

Sometime in November 2008,[4] the Park Service issued a request to renovate and repair the Commandant's House. Pl.'s Mem. 6; Pl.'s Mem., Ex. 6, Charlestown Navy Yard Bos. Nat'l Historical Park, Repaint Commandant's House Exterior, Specifications (2008), ECF No. 68–4. The contractor hired to perform the work informed the Park Service that the railing in question did not comply with Massachusetts building codes, and thus the contractor refused to work unless it was absolved of any responsibility for injuries that might arise out of the railing. Pl.'s Mem. 6; Pl.'s Mem., Ex. 7, Email from Marc Green, Estimator, Custom Copper and Slate Ltd., to Mattie Walker (Mar. 30, 2010, 10:29 EST), ECF No. 68–4.

## II. ANALYSIS

### A. Motion to Dismiss a Federal Tort Claims Action

This is a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack

---

3. Several exhibits share the same ECF number.

4. Mahon asserts that the date of the request was "undisclosed" but the specification form for the Commandant's House exterior has the date "November 2008." Pl.'s Mem., Ex. 6, Charlestown Navy Yard Bos. Nat'l Historical Park, Repaint Commandant's House Exterior, Specifications (2008), ECF No. 68–4.

of subject matter jurisdiction. Thus, while this Court should accept the plaintiff's well-pled factual allegations as true and draw all reasonable inferences in favor of the plaintiff, it should also consider evidentiary materials such as depositions, exhibits, and affidavits. *Aversa v. United States*, 99 F.3d 1200, 1209–10 (1st Cir. 1996).

## B. Discretionary Function Exception Under the Federal Tort Claims Act

██ The Federal Tort Claims Act ("FTCA") "provides a 'carefully limited waiver' of the federal government's sovereign immunity for certain claims alleging harm caused by United States employees or agents." *Carroll v. United States*, 661 F.3d 87, 93 (1st Cir.2011) (quoting *Bolduc v. United States*, 402 F.3d 50, 62 (1st Cir. 2005)). Where the FTCA does not waive immunity for specific torts, the federal courts lack subject matter jurisdiction. *Id.* at 93 (citations omitted).

Among other limitations, the FTCA bars claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). This provision is known as the discretionary function exception. *See, e.g., United States v. Gaubert*, 499 U.S. 315, 319, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). The Supreme Court has promulgated a two-part test to determine when the discretionary function exception applies: first, whether the act had an element of choice so that no federal statute, rule, or regulation specifically prescribes how the agency must act; second, whether the act in question is based on public policy considerations or "susceptible to policy analysis." *Id.* at 324–25, 111 S.Ct.

1267. The discretionary function exception is designed to prevent "judicial second guessing" of agency decisions based on social or economic policy. *Berkovitz v. United States*, 486 U.S. 531, 536–37, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988).

██ A court determining whether the discretionary function applies does not need to determine whether the agency actually discussed the potential decision, but rather whether such a decision prescinds from a policy-based analysis. *Shansky v. United States*, 164 F.3d 688, 692 (1st Cir. 1999). There is no "requirement that the government, as a prerequisite to invoking the discretionary function exception, demonstrate that a policy judgment was actually made. The discretionary function exception applies to all acts and omissions that are susceptible to policy analysis, whether or not that analysis has been performed on a given occasion." *Fothergill v. United States*, 566 F.3d 248, 253 (1st Cir. 2009).

## C. Safety Management Plans and the Discretionary Function Exception

The 2006 Management Policies for the Park Service (the "Management Policies") set forth mandates for parks to carry out, and state that the specific means of achieving the mandate lie within the discretion of agency employees. Def.'s Mem., Ex. 1, Management Policies § 8.2.5.1, ECF Nos. 50–52; *see Brown v. United States*, 661 F.Supp.2d 341, 362 (E.D.N.Y.2009) (stating that the plain language of this section of the Management Policies "grants considerable discretion to NPS [National Park Service] officials" in balancing safety concerns with practical realities such as budgeting and preserving park resources, and stating that Congress had determined that Park Service officials were in the best position to consider such "competing demands" and

Congress intended for Service officials to exercise judgment in deciding whether certain safety precautions are needed). Courts have routinely ruled that decisions based on the balance between safety and aesthetics fall within the discretionary function exception. *See, e.g., Shansky,* 164 F.3d at 693, 695–96; *Blackburn v. United States,* 100 F.3d 1426, 1433–34 (9th Cir. 1996) (holding that discretionary function applied when plaintiff alleged there were inadequate warnings about the danger from diving off of a bridge into a river, and the decision was one of safety versus aesthetics);[5] *Valdez v. United States,* 56 F.3d 1177 (9th Cir.1995) (holding that the policy guidelines regarding safety are carried out through discretionary decisions of Park Service employees; discretionary function applied when plaintiff, who fell off of a rocky outcrop on a trail, alleged that there were inadequate warning signs); *Brown,* 661 F.Supp.2d at 362.

The First Circuit's decisions in *Shansky* and *Fothergill* are especially instructive. In *Shansky,* a plaintiff tripped on a wooden staircase leaving an historic building. *Shansky,* 164 F.3d at 690. The plaintiff alleged that the Park Service ought have installed a handrail or some sort of warning sign. *Id.* Additionally, the plaintiff claimed that a statement in the Park Service's Cultural Resources Management Guidelines, "[t]he saving of human life will take precedence over all other management activities," prescribed a course of action for the Park Service to follow. *Id.* at 691.

The First Circuit stated that this guideline did not prescribe a specific course of action; instead the Cultural Resources Management Guidelines suggested that the Park Service had discretion in how to apply and achieve that broad safety goal. *Id.* The First Circuit further noted that, according to the Cultural Resources Management Guidelines, the public use of park resources may involve elements of risk, and that the Park Service had discretion to choose how to balance that risk while respecting park resources. *Id.*

The "critical question," said the court, is whether the acts or omissions are "susceptible to a policy-driven analysis." *Id.* at 692. The court stated that choosing aesthetics over safety was a plausible policy justification. *Id.* at 693. The Park Service apparently strove to preserve the building's historical accuracy by not having a sign at the stairway, and such a decision was within the purview of the discretionary function exception. *Id.* at 693–96. Absent a specific course of action of how to carry out the safety mandate, however, the agency will be protected by the discretionary function exception. *Id.* at 691.

In *Fothergill,* a car crashed through the front entrance of a Post Office and injured two plaintiffs. *Fothergill,* 566 F.3d at 250. The plaintiffs sued the United States under the Federal Tort Claims Act, alleging that the Post Office parking lot was negligently designed in allowing cars potentially to crash through the front entrance as there was no barrier or curb between the parking lot and the front entrance.[6] *Id.* at 252. The court stated that the focus of the

---

5. The Ninth Circuit, however, requires that some decision actually be made, while the First Circuit does not. *Compare Blackburn,* 100 F.3d at 1433, *with Shansky,* 164 F.3d at 691–92 *and Fothergill,* 566 F.3d at 253.

6. The plaintiffs had not opposed the United States' motion to dismiss for lack of subject matter jurisdiction in the trial court, thus the First Circuit did not apply the legal standard requiring it to accept the factual allegations as true, but rather reviewed the trial court's decision for plain error. *Fothergill,* 566 F.3d at 251–52.

complaints was "on the Postal Service's decisionmaking with respect to the implementation (or eschewal) of safety measures in connection with its operation of the post office." *Id.* at 253.

The First Circuit stated that the plaintiffs had not identified any law, rule, or regulation that prescribed how the Post Office ought have constructed the parking lot. *Id.* The court also stated that the questions whether to install barriers, curbs, or implement other features in regard to the parking lot were choices "informed by a need to balance concerns about a myriad of factors such as efficiency, safety, aesthetics, and cost. In other words, those choices are readily susceptible to policy analysis." *Id.*

The plaintiffs in *Fothergill* also argued that the Postal Service had not conducted any such balance of policy considerations. *Id.* To this, the *Fothergill* court stated that the Postal Service was not required to have made an actual decision balancing policy considerations, and that "[t]he discretionary function exception applies to all acts and omissions that are susceptible to policy analysis, whether or not that analysis has been performed on a given occasion." *Id.* The court noted that even had the Postal Service acted negligently, the discretionary function exception protects the agency "regardless of whether the decisionmaker acted negligently or manifestly abused the granted discretion." *Id.* at 254 (citing 28 U.S.C. § 2680(a); *Ayer v. United States,* 902 F.2d 1038, 1041 (1st Cir.1990)); *see Cyr v. United States,* No. 5:10–cv–194, 2011 WL 2489877, at *11, 2011 U.S. Dist. LEXIS 66307, at *32–33 (D.Vt. June 21, 2011) (same).

█ Here, the Management Policies prescribe how nationally-owned park property, such as the Commandant's House, ought be handled. They contain a mix of safety requirements and historic preserva-

tion requirements. *See, e.g.,* Management Policies § 5.3.5.4.7 "Use of Historic Structures" (requiring federal parks "to use, to the maximum extent feasible, historic properties available to it whenever operationally appropriate and economically prudent"); § 8.2.5.1 "Visitor Safety" ("The Service will strive to identify and prevent injuries from recognizable threats to the safety and health of persons and to the protection of property by applying nationally accepted codes, standards, engineering principles, and ... Director's Orders ... and their associated reference manuals."). The Management Policies state that they do not impose park-specific visitor safety precautions, and they further state that discretion is left to park officials to determine what safety precautions ought be taken. *Id.* § 8.2.5.1. The Management Policies also state that "[p]ark visitors must assume a substantial degree of risk and responsibility for their own safety when visiting areas that are managed and maintained as natural, cultural, or recreational environments." *Id.*

Mahon alleges that the Boston Park ought have used a "concession contract," under which the Management Policies would require the Boston Park to adopt a risk management plan that would in turn have identified the railing's height as a problem. Pl.'s Mem. 10. The Commandant's House itself is under a General Management Plan which greatly restricts what alterations may be made, so that such alterations do not affect its historic appearance. Decl. W. Lewis Barlow IV FAIA, Ex. 4, 2 Charlestown Navy Yard, Bos. Nat'l Historical Park, Gen. Mgmt. Plan 21–22 (1980), ECF No. 10–4. The General Management Plan for the Charlestown Navy Yard denotes the Commandant's House as an "Exhibit in Place" which allows but minimal alterations and mandates that "[a]ll development actions

shall be to preserve or restore a 1973 appearance." *Id.*

A later interaction between the Boston Park and a contractor concerning the railing's height resulted in no alteration, notwithstanding a repair done on the upright's base so that the railing would fit into designated slots. Reply Br. U.S., Attach. 1, Aff. David Brouillette ("Brouillette Aff.") ¶ 5, ECF No. 70–2. It was determined that alteration would alter the historic appearance of the house. *Id.* ¶ 4. Thus, even had Boston Park conducted a risk management plan, it appears that the railing would have remained intact as originally constructed and thus would not have prevented Mahon's unfortunate accident. Reply Br. U.S. 7–8.

Mahon claims that a memorandum from the Secretary of the Interior includes a requirement for the Boston Park to raise the railing's height. Pl.'s Mem., Ex. 11, Nat'l Park Serv. U.S. Dep't of the Interior, Interpreting the Sec'y of the Interior's Standards for Rehab., ITS No. 46 at 1 ("Rehab. Standards"), ECF No. 68–7. The memorandum, however, specifies that it applies to altering the interior railings of historic buildings. *Id.;* Reply Br. U.S. 3 n. 2. The memorandum also states it is intended to apply when a variance cannot be obtained, a circumstance not raised by Mahon. Rehab. Standards 1; Reply Br. U.S. 3 n. 2.

What safety measures to take, if any, is within the United States' discretion so long as the decision is based on policy considerations. No actual decision or consideration of competing factors is required by the Boston Park, for there is a plausible policy justification of keeping the historic appearance of the Commandant's House as opposed to raising the railing in order to lower the safety risk to visitors.

If, *arguendo*, the Boston Park had a concession contract, carried out a risk management plan, and failed to address the railing height, the outcome of this case would be no different. The decision to alter the railing height is based on the plausible policy consideration of aesthetics versus safety. When the contractor who was hired to renovate the house brought up concerns regarding the railing's height, the Boston Park did not alter the railing, stating its desire to keep the historic appearance of the Commandant's House intact. Brouillette Aff. ¶ 4. The presence or absence of a risk management plan would not alter the scope of the discretionary function exception. Here, carrying out even a prescribed safety mandate would have to be balanced against aesthetic and historic considerations. This involves discretion on the part of the agency. *Fothergill,* 566 F.3d at 253; *Shansky,* 164 F.3d at 691.

## III. CONCLUSION

For the foregoing reasons, this Court GRANTS the United States' motion to dismiss, ECF No. 47. The United States' motion for summary judgment, ECF No. 47, is therefore moot.

**SO ORDERED.**